**DICTOGRAPH PRODUCTS, Inc.,**
Petitioner,

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 57, Docket 22927.

United States Court of Appeals
Second Circuit.

Argued Oct. 14 and 15, 1954.
Decided Dec. 15, 1954.

Theodore F. Tonkonogy, New York City, for petitioner.

Earl W. Kintner, Robert B. Dawkins and Alan B. Hobbes, Washington, D. C., for respondent.

Before CHASE, MEDINA and HARLAN, Circuit Judges.

MEDINA, Circuit Judge.

This is a proceeding to review an order of the Federal Trade Commission directing petitioner to eliminate from its contracts with independent distributors certain restrictive, exclusive-dealing clauses and to cease and desist from certain practices connected therewith, in alleged violation of Section 3 of the Clayton Act, 15 U.S.C.A. § 14, and Section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45(a)(c).

For many years petitioner and its predecessor company have manufactured and distributed hearing aids under its -trade name "Acousticon." Due to the fact that there are said to be from 25,-

000,000 to 55,000,000 persons in the United States who are hard of hearing and to the rapid development in recent years of electronics and allied areas of scientific knowledge, the industry has had phenomenal growth, especially since 1940 or thereabouts. Since long prior to that date petitioner has been one of the largest manufacturers of hearing aids, although there is nothing in the voluminous record now before us to indicate that petitioner now or at any time had a "dominant" position in the hearing aid business.

In the period 1944–1949 petitioner's sales of hearing aids and of parts and accessories were as follows:

| Year | Hearings Aids | Parts & Accessories |
|------|---------------|---------------------|
| 1944 | $ 741,874 | $257,933 |
| 1945 | 1,041,097 | 162,100 |
| 1946 | 2,231,570 | 187,761 |
| 1947 | 1,937,432 | 269,182 |
| 1948 | 1,763,955 | 200,757 |
| 10 Mos. 1949 | 1,546,797 | 142,025 |

While some makes of hearing aids are sold by at least one mail order house and in department, optical and drug stores over the counter, the best market for the manufacturers of hearing aids is the independently established retail distributor, whose business is devoted entirely to the fitting and sale of hearing aids to the hard of hearing public, and these distributors also serve as the best market for parts and accessories.

There is substantial evidence to sustain the findings below that there are only approximately 1000 established responsible distributors specializing in the sale of hearing aids in the United States and, of these, 220 are distributors of the "Acousticon," operating generally under "franchises" from petitioner for designated territories and always pursuant to the terms of the restrictive, exclusive-dealing agreements which, together with the arrangements which commonly accompany them, forbid dealing in the products of competitors and in the sale or distribution of used instruments which are traded in or may be otherwise procured or obtained; and the strict enforcement of such agreements has had the effect of establishing and maintaining an area or segment of the hearing aid business in which the independent distributors of the "Acousticon" will not undertake to sell the hearing aids of competing manufacturers but deal only in the "Acousticon," despite requests by competing manufacturers that they handle their products, and despite the fact that many independent distributors handle more than one make of hearing aid. Accordingly, it was found by the hearing examiner and by the Commission:

"Respondent's distributors constitute a substantial segment of the outlets for sale of hearing aids and supply coverage for the more important trade areas of the United States. In such segment the respondent has effectively established a monopoly. Competing manufacturers of hearing aids have suffered substantial injury in the form of loss of sales and inadequate distribution of their competing products as a result of the respondent's requirements that its distributors and dealers handle only the products manufactured and sold by the respondent, and such competing manufacturers have been forced to sell less desirable outlets for their products such as optical stores, department stores and drug stores."

There are various terms of the agreements which serve to implement the exclusive-dealing features, the most important of which is the following restrictive covenant, which applies in case the agreement be cancelled by either party, as would doubtless be the result of any persistent attempt by the distributor to sell the hearing aids of competitors:

"21. In the event of the termination of this agreement by either party, Distributor expressly covenants and agrees that for a period of one year from the date of said termination Distributor will not, di-

rectly or indirectly, carry on, or be engaged, employed or interested in any hearing aid business within the territory outlined in Paragraph '2' hereof, either alone or jointly with, or as agent or employee of, any person, firm or corporation, and that during said one year period, within the aforesaid territory Distributor will not, in any manner whatever, solicit or accept the custom, trade, or business of any user of or prospect for hearing aids. Distributor further covenants and agrees not to do any other act that shall or may prejudice the business of the Company or any other Distributor of the Company within the territory outlined in Paragraph '2' hereof."

These findings are supported by substantial evidence and we see no occasion to review the evidence in detail.

It is claimed that, as matter of law, the proofs fall short of the basic requirement of Section 3 that the effect of the use of these restrictive, exclusive-dealing agreements, "may be to substantially lessen competition or tend to create a monopoly." It is asserted that "competition in the industry has in fact increased," and this assertion is based upon the fact that from less than twenty in the years 1938 to 1940 the number of manufacturers of hearing aids has increased to over eighty, that competition at all times was and is keen and active, that newcomers to the industry have been able to establish themselves and increase the sale of their products from year to year and that "there is plenty of business for everyone." But the fact remains that petitioner has maintained its position, during all this period of growth of the industry, as one of the top three in the business, and at least two other leading manufacturers maintain effective control of a substantial number of established distributors by means of similar restrictive, exclusive-dealing agreements.

Thus, it is apparent that the first question presented for our resolution relates to the necessary evidence required to bring this case within the qualification to the otherwise general proscriptive language of Section 3 of the Clayton Act. Specifically, we are required to decide whether the phrase "may be to substantially lessen competition or tend to create a monopoly" precludes a finding of unlawful conduct under Section 3, in the absence of a showing that as a result of the use of these exclusive-dealing arrangements there has, in fact been or probably will be a diminution in competitive activity, or in the face of evidence tending to indicate that the number of competitors in a particular line of commerce has increased.

Closely related to this question of the sufficiency of the government's evidence to establish a violation of Section 3 of the Clayton Act is the problem of what proof, if any, may be introduced to refute the inferences to be drawn from the proof of the employment of these restrictive devices by the petitioner or to establish a justification for their use. It is to this latter problem that the other main contention of petitioner principally relates. Specifically, petitioner has gone to great pains to trace the development and improvement of its product, emphasizing the large expense over the years for research and engineering, demonstrating its solicitude for the hard of hearing and its efforts to use the most effective psychological and "philosophical" approach to those who hate the very thought of wearing a hearing aid, and for the employment of the most up-to-date apparatus and techniques to determine precisely the needs of each individual prospective customer. As a result of these unceasing efforts to improve its product and the training programs which it has furnished to the independent retailers with whom it deals, petitioner asserts that it has an established good will and a reputation for the excellence of its product and that these exclusive-dealing contracts are indispensable to the maintenance of its status and are necessary to prevent the almost certain diminution in the quality of its

service to the public which would occur if its distributors were permitted to sell other makes of hearing aids in addition to "Acousticon." Petitioner thus offers a two-pronged justification for its use of exclusive-dealing arrangements, one cast in terms of economic necessity and the other in terms of the public interest.

The opinion of the Supreme Court in Standard Oil Co. of California v. United States, 1949, 337 U.S. 293, 69 S.Ct. 1051, 1062, 93 L.Ed. 1371, appears in large measure to be dispositive of the first of these issues and offers much assistance in the resolution of the second. In that case, suit was brought to enjoin the Standard Oil Company of California and its wholly owned subsidiary, Standard Stations, Inc., from enforcing or entering into exclusive supply contracts with independent dealers in petroleum products and automobile accessories. In an effort to establish that these practices were violative of Section 1 of the Sherman Act, 15 U.S.C.A. § 1, and Section 3 of the Clayton Act, evidence was introduced showing: that the Standard Oil Company of California, through its own service stations, sold petroleum products to independent service stations and to industrial users in Arizona, California, Idaho, Nevada, Oregon, Utah and Washington; that it was the largest seller of gasoline in the area, its total sales amounting to 23% of the total taxable gallonage sold there; that 6.7% of the total taxable gallonage sold in the area was sold by Standard to independent service stations under exclusive-dealing contracts; that the dealers with whom Standard had these contracts comprised 16% of the retail gasoline outlets in the area; and that Standard's major competitors employ similar exclusive-dealing arrangements. In affirming the District Court's decree granting the injunction, its exclusion of testimony concerning the economic merits of the system used as contrasted to other possible systems and its determination that it was unneces-

sary to make findings concerning the comparative economic status of Standard and its competitors before and after the adoption of that system, the Supreme Court addressed itself to the proscriptive effect of Section 3 of the Clayton Act and found it necessary to construe the very same qualifying phrase with which we are now concerned.

After reviewing its previous decisions which had indicated that proof of the use of exclusive-dealing agreements by a dominant power in an industry was all that was necessary to establish a violation of Section 3 of the Clayton Act and the extension of that doctrine in the case of contracts tying the sale of non-patented to patented products to situations where it is shown merely that the volume of business affected was not insubstantial and that competitors were preempted from a substantial market,[1] the Court concluded that "the qualifying clause of § 3 is satisfied by proof that competition has been foreclosed in a substantial share of the line of commerce affected." This disposed of an assertion virtually identical with the first contention of the petitioner in the instant case. The Court stated, 337 U.S. at pages 311, 314, 69 S.Ct. at pages 1060, 1062:

"We are dealing here with a particular form of agreement specified by § 3 and not with different arrangements, by way of integration or otherwise, that may tend to lessen competition. To interpret that section as requiring proof that competition has actually diminished would make its very explicitness a means of conferring immunity upon the practices which it singles out. Congress has authoritatively determined that those practices are detrimental where their effect may be to lessen competition.

\* \* \* \* \* \*

"It cannot be gainsaid that observance by a dealer of his requirements contract with Standard does

1. International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; Cf. Signode Steel Strapping Co. v. Federal Trade Commission, 4 Cir., 1942, 132 F.2d 48, 53–54.

effectively foreclose whatever opportunity there might be for competing suppliers to attract his patronage, and it is clear that the affected proportion of retail sales of petroleum products is substantial. In view of the widespread adoption of such contracts by Standard's competitors and the availability of alternative ways of obtaining an assured market, evidence that competitive activity has not actually declined is inconclusive. Standard's use of the contracts creates just such a potential clog on competition as it was the purpose of § 3 to remove wherever, were it to become actual, it would impede a substantial amount of competitive activity."

Thus it appears clear that unless the petitioner's second contention seeking to justify the employment of these exclusive dealing arrangements upon economic grounds or because their use is in the public interest, is sustained, the proof adduced herein, indicating that the petitioner has been doing business amounting to $2,000,000 a year and has, through these contracts, foreclosed competitors from dealing with more than 22% of the nation's choicest retail outlets for hearing aids, would seem not only to support but virtually to compel a finding that Section 3 has been violated.

█ █ Preliminarily, it should be noted that potential or even probable adverse effects upon petitioner's business alone is not a sufficient basis for withholding injunctive relief. Were we to hold otherwise, we would quite effectually draw the teeth of Section 3 and of the antitrust laws generally. It appears self evident that any prohibition upon behavior which stifles competition will necessarily enure to the immediate economic disadvantage of the individual or business organization engaging in that behavior. The more efficacious these clauses are in the maintenance of petitioner's competitive position, the clearer is the case against permitting their continued use. We are thus constrained to

conclude that it is only when the factors relating to economic necessity and public interest take the case outside the scope of the purpose for which the particular prohibition was imposed that they become relevant. Whether organizations situated as is the petitioner can ever successfully avail themselves of any opportunity to introduce evidence of economic data to remove themselves from the proscriptive effect of Section 3 is a question which underlies both of petitioner's main contentions. On the one hand, petitioner sought to accomplish this by demonstrating that competition had not diminished because of the use of these devices and on the other, by asserting that the purpose of their use was not to suppress competition but to attain legitimate economic ends. Assuming the appropriateness of allegations of this nature in a suit brought under the Sherman Act, we still must examine the extent of their efficacy under Section 3 of the Clayton Act.

█ There is little doubt that Congress, in passing the Clayton Act, sought to bring within the scope of its proscriptive provisions, conduct and practices which though dangerous to the competitive structure, were not covered at all or only inadequately covered by the provisions of the Sherman Act. Senate Rep. No. 698, P. 1, 63rd Cong. 2d Sess. (1914); H.R.Rep. No. 627, P. 13, 63rd Cong. 2d Sess. (1914). Thus, in connection with the specific practices condemned by the later Act, the standards of legality previously applied were rejected and new criteria substituted therefor. Standard Fashion Co. v. Magrane-Houston Co., 1922, 258 U.S. 346, 356, 42 S.Ct. 360, 66 L.Ed. 653.

█ With respect to exclusive-dealing contracts, the evident impulsion toward including a specific proscriptive provision was the desire on the part of the Congress to overrule by legislation an earlier decision of the Circuit Court of Appeals in Whitwell v. Continental Tobacco Co., 8 Cir., 1903, 125 F. 454, 64 L.R.A. 689, upholding, as not violative of the Sherman Act, what was tantamount to the refusal, by a leading producer of chew-

ing tobacco, to sell to a dealer because the dealer would not agree to deal exclusively in the seller's products, 51 Cong. Rec. 16318 (1914). It was to make sure that the Sherman Act "rule of reason" would not be employed to validate further transactions of such a patently undesirable nature that the proscriptive provision under discussion was thought necessary. It is hardly likely that the insertion of the qualifying phrase, "where the effect. * * * may be to substantially lessen competition or tend to create a monopoly", was intended to reinstate the same Sherman Act tests which had, at that very time, been determined to be inadequate.

Moreover, the history of the inclusion of the qualifying phrase in no way supports the view that it was designed to effect a renaissance of the Sherman Act type of inquiry into all economic factors, in every Clayton Act suit to enjoin the use of an exclusive-dealing contract.

At the time of its initial approval by the House of Representatives, that portion of the Clayton Bill relating to exclusive-dealing contracts contained an unqualified proscription of agreements of such a nature. See § 4 of the Clayton Bill in H.R.Rep. No. 627, P.2, 63rd Cong. 2d Sess. (1914). However, the Senate Judiciary Committee, apparently in the belief that the Federal Trade Commission Bill then pending would adequately cover this matter, struck the section entirely. Upon a reconsideration of the Committee's action on the floor of the Senate, issue was taken with the unqualified nature of the House version only in so far as it declared these contracts unlawful even when engaged in by newcomers or small business enterprises in a particular line of commerce who, perhaps, could effectively compete with established interests only if these devices were available to them. 51 Cong.Rec. 14094 (1914). It may be inferred, therefore, that the Conference Committee's compromise provision, which included this qualification in the exclusive-dealing contract section for the first time, was designed to accomplish no more than the protection of the "newcomer" or "small" business organization.

In so doing, it is hard to believe that the Congress envisioned a full dress inquiry into economic motives or effects of such contracts in all cases, including those involving the use of these devices by established leaders or prominent businesses in an industry. Certainly such a view is more in consonance with the evident congressional purpose in passing the Clayton Act than is a view which could conceivably obliterate any distinction between the test applicable here and the tests previously applied.

The cases in which the Supreme Court has dealt with the problem of exclusive-dealing arrangements evince a recognition of the legislative intention outlined above. Where the alleged violator dominated or was a leader in the industry, proof of such fact was, at an early stage, determined to be a sufficient predicate from which to conclude that the use of exclusive-dealing contracts was violative of Section 3 and other factors appear to have been largely ignored. Standard Fashion Co. v. Magrane-Houston Co., supra; Fashion Originators' Guild v. Federal Trade Commission, 1941, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; Cf. United Shoe Machinery Corp. v. United States, 1922, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708; International Business Machines Corp. v. United States 1936, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085. More recently, the Supreme Court extended the rule to business organizations enjoying a powerful, though clearly not dominant, position in the trade and doing a substantial share of the industry's business by means of these contractual provisions and tacitly approved the trial court's refusal to consider other economic effects or merits of the system employed. Standard Oil Co. of California v. United States, supra. In so doing, great reliance was placed upon the congressional purpose to supplement earlier anti-trust laws by the passage of Section 3. The Court stated:

"It seems hardly likely that, having with one hand set up an express

prohibition against a practice thought to be beyond the reach of the Sherman Act, Congress meant, with the other hand, to reestablish the necessity of meeting the same tests of detriment to the public interest as that Act had been interpreted as requiring. * * * To insist upon such an investigation would be to stultify the force of Congress' declaration that requirements contracts are to be prohibited wherever their effect 'may be' to substantially lessen competition." 337 U.S. at pages 312–313, 69 S.Ct. at pages 1061–1062.

Only two Supreme Court cases remain for further consideration. The first, Federal Trade Commission v. Sinclair Refining Co., 1923, 261 U.S. 463 43 S.Ct. 450, 67 L.Ed. 746, referred to in the Standard Oil case as supporting the company's position, actually held nothing more than that the Clayton Act was inapplicable because the contracts were not exclusive-dealing agreements within the provisions of Section 3. The economic inquiry involved related to alleged violations of the unfair competition proscription of Section 5 of the Federal Trade Commission Act. In determining whether these practices constituted unfair competition, the declared inapplicability of the Clayton Act required that the court revert to the Sherman Act which, in turn, required the economic analysis in which the court indulged.

The Supreme Court's per curiam affirmance of the Circuit Court's consideration of economic motives and effects of the exclusive-dealing contracts in Pick Mfg. Co. v. General Motors Corporation, 7 Cir., 1935, 80 F.2d 641, 643, affirmed 1936, 299 U.S. 3, 57 S.Ct. 1, 81 L.Ed. 4 is more troublesome. The erroneous description, in the opinion of the Circuit Court of Appeals, of the Clayton Act qualification as requiring that " 'the effect of the agreement will be to lessen competition substantially' ", rather than the actual statutory test requiring that the effect "may be" to substantially lessen competition, conjoined with its misplaced reliance on the Sinclair case,

may account for its indulgence in a Sherman Act type of inquiry. In view of the Supreme Court's per curiam affirmance, however, we must conclude that the reasoning of the Circuit Court of Appeals in the Pick case was not approved, and, in any event, such reasoning is quite at variance with that of the Supreme Court in Standard Oil Co. of California v. United States, supra.

■ In light of the foregoing, it seems clear that whatever utility the elaborate economic inquiry contended for by petitioner may still have under Section 3 of the Clayton Act when applied to organizations not doing a substantial share of the business or not yet firmly established in a particular line of commerce, it has no place in a case such as this where the condemned contracts are being employed by a corporation which does almost $2,000,000 worth of business each year, is one of the industry's three leaders, all or some of whom use this restrictive device, and which alone controls by such means over one-fifth of the nation's prime retail outlets for products of this kind. Accordingly, we need not, weigh the claims of petitioner that its Acousticon hearing aid is the best in the market; it may be assumed that it has marked superiority over some of the many others available. We are not concerned with the merits of petitioner's product but only with the probable effect on competition of the use of these restrictive, exclusive-dealing covenants. It is the policy of the Congress that this merchandise must stand on its own feet in the open market, with whatever benefits may be derived from the use by petitioner of its own methods both psychological, "philosophical" or otherwise, but without the competitive advantage to be obtained by the use of the prohibited exclusionary agreements. Under this view of the proscriptive effect of Section 3, it is immaterial that most of the dealers with whom these contracts were entered into were brought into the hearing aid business by the petitioner.

The furnishing to petitioner's distributors of names and addresses of users of the Acousticon hearing aid in their ter-

ritories, together with additional names and addresses of prospects obtained through the use of various advertising media, and the pamphlets, mechanical testing apparatus and other material, would seem to be the legitimate property of petitioner. Nothing in the cease and desist order now before use for review would seem to prevent petitioner from protecting itself against the use of such data and material in the sale of the products of competitors.

It may well be that, after the removal of the prohibited clauses, many if not most of petitioner's distributors will voluntarily prefer to deal exclusively with the "Acousticon" hearing aid and its parts and accessories. If it possesses the virtues extolled by the petitioner's witnesses, there would seem to be sound business reasons for believing that this will be so. But if others, whose clientele may not be composed of so many people of means, desire to take on the products of other manufacturers which command a lower price, even if not of so superior a quality in appearance or performance, and also to sell used instruments which have been traded in or otherwise obtained, the result will be the very result intended by the framers of the statute.

We entertain no doubt that the main features of the determination made by respondent herein are in the public interest. The philosophy of the anti-trust laws in this regard were summed up in Standard Oil Co. of California v. United States, supra, by the statement that, 337 U.S. at page 309, 69 S.Ct. at page 1060:

"But Standard was a major competitor when the present system was adopted, and it is possible that its position would have deteriorated but for the adoption of that system. When it is remembered that all the other major suppliers have also been using requirements contracts, and when it is noted that the relative share of the business which fell to each has remained about the same during the period of their use, it would not be farfetched to infer that their effect has been to enable the established suppliers individually to maintain their own standing and at the same time collectively, even though not collusively, to prevent a late arrival from wresting away more than an insignificant portion of the market. If, indeed, this were a result of the system, it would seem unimportant that a short-run by-product of stability may have been greater efficiency and lower costs, for it is the theory of the antitrust laws that the long-run advantage of the community depends upon the removal of restraints upon competition."

We find it unnecessary to discuss the remaining miscellany of minor contentions advanced by petitioner.

Affirmed.