MYTINGER & CASSELBERRY, INC., Lee S. Mytinger and William S. Casselberry, Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 16092.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 13, 1961.

Decided March 1, 1962.

536

Mr. Charles S. Rhyne, Washington, D. C., with whom Mr. W. Dean Wagner, Washington, D. C., was on the brief, for petitioners.

Mr. Francis C. Mayer, Atty., Federal Trade Commission, with whom Mr. James McI. Henderson, Gen. Counsel, Federal Trade Commission, and Mr. Alan B. Hobbes, Asst. Gen. Counsel at the time the brief was filed, were on the brief for respondent.

Before WILBUR K. MILLER, Chief Judge, and FAHY and BURGER, Circuit Judges.

FAHY, Circuit Judge.

The case is before this court on petition to review an order of the Federal Trade Commission. The petitioners are Mytinger & Casselberry, Inc., a corporation, Lee S. Mytinger, its secretary-treasurer, and William S. Casselberry, its president.[1] We shall refer to these parties, who were respondents before the Commission, as petitioners. Following the issuance of a Commission complaint, a hearing was held before an Examiner, who submitted an initial decision and a proposed order to cease and desist. Petitioners appealed to the Commission. The Commission denied the appeal and, as modified, adopted the Hearing Examiner's findings and proposed order. This petition for review followed.

Petitioners were found by the Commission to have violated section 3 of the Clayton Act, set forth below,[2] and section 5 of the Federal Trade Commission Act, also set forth.[3] The finding of Clayton Act violation grew out of petitioners' method of marketing in commerce, by which they bound the distributors of their product by contract, which they enforced, not to sell or distribute the product of any competitor of petitioners.

The Commission found that petitioners by enforcing or threatening to enforce the exclusive-dealing provision had also violated section 5 of the Federal Trade Commission Act, that a companion restrictive covenant which provided that in the event a distributor terminated his relationship with petitioners he could not for two years solicit as customers for any competitive products any former customers of petitioners' product was likewise violative of section 5, and, finally, that petitioners by misrepresenting the nature of a consent decree entered against them in the United States District Court for the Southern District of California had engaged in unfair meth-

1. Mytinger & Casselberry, Inc., has been succeeded in interest by the Mytinger Corporation. By stipulation the parties herein have agreed that any final order of this court will be binding on the Mytinger Corporation.

2. "Sec. 3. That it shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies or other commodities * * * on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."
38 Stat. 731 (1914), 15 U.S.C. § 14 (1958), 15 U.S.C.A. § 14.

3. "Sec. 5. (a) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are hereby declared unlawful.
"The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations * * * from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."
52 Stat. 111 (1938), as amended, 15 U.S.C. § 45(a) (1958), 15 U.S.C.A. § 45(a).

ods of competition within the meaning of section 5.

The product petitioners market is a multi-vitamin and mineral food supplement called Nutrilite Food Supplement. It is produced by a corporation known as Nutrilite Products, Inc. Petitioners purchase this company's entire output of Nutrilite and market it by a house-to-house direct-selling system through some 80,700 distributors, of whom 1,420 purchase Nutrilite directly from petitioners. These direct purchasers or distributors in turn redistribute the product to the other distributors for direct sale to the public. Petitioners' contracts with all these distributors contain the restrictive provisions found illegal by the Commission.

In addition to the exclusive-dealing and two-year restrictive provisions the contract of petitioners with the distributors of Nutrilite provide as follows:

"I [the distributor] understand and agree that I am not an employee, servant, agent, or legal representative of Mytinger & Casselberry, Inc., and that the relationship between us is not that of joint venture or similar arrangement, but that as a Nutrilite Distributor I am in business on my own account as an independent contractor who purchases and sells Nutrilite Food Supplement."

Thus, the distributors are not employees of petitioners but are independent business enterprises.

The Clayton Act question is whether the contract provision binding the distributors not to sell or distribute any competitive item has the effect of substantially lessening competition in any line of commerce within the meaning of section 3 of the Act.

There are from 400 to 500 items competitive to Nutrilite which are sold by the same door-to-door method by which petitioners market Nutrilite; and there are allegedly some 50 to 100 competitive items sold in drug stores.

Evidence was also introduced that items competitive to Nutrilite are marketed by mail order, in department stores, food and supermarkets, variety stores and other outlets. Nevertheless, sales of Nutrilite in 1958 came to $19,145,000, which accounted for 61.52 per cent of all direct house-to-house sales of vitamin concentrates, 34.6 per cent of the total sales of multi-vitamin mineral products similar in composition to Nutrilite, and 8.6 per cent of the total value of retail sales of vitamin concentrates sold through all types of outlets. In this last and all inclusive line of commerce Nutrilite's share of the national market between 1951 to 1957 has varied from a low of 6.7 per cent in 1951 to a high of 13.4 per cent in 1955. During this period Nutrilite's sales increased from $9,881,000 in 1951 to $26,514,000 in 1956. This gave petitioners 96.40 per cent in 1951 and 75 per cent in 1956 of the direct-sales market for vitamin concentrates.

Petitioners contend that the relevant line of commerce within which to judge whether their exclusive-dealing arrangements may substantially lessen competition is the total national retail market for food supplement products whether distributed directly to the consumer or through established retail outlets. And petitioners assert that due to their direct-selling method, the market foreclosure which they contend is necessary to prove the Clayton Act violation cannot occur since retail outlets are limitless and any adult person may serve as a potential distributor of a competitor's product. Petitioners also contend that the Commission has applied a per se theory, meaning by this, as we understand, that the Commission concluded that petitioners' exclusive-dealing contracts substantially lessen competition because petitioners do a large volume of business subject to the contracts.

Considering first the per se contention, while the Commission emphasizes the volume of petitioners' business its decision rests not upon this but upon findings that this business constitutes a substantial percentage of the relevant lines of commerce and that the distributors who hold this percentage can offer to their

customers no competitive product. The Commission's decision states, "it is obvious that respondents' [petitioners herein] volume of business is substantial and that their exclusive dealing requirement affects a substantial share of the market in each of the three lines of commerce." The relevant lines of commerce referred to are: (1) vitamin and mineral combination preparations marketed through all types of retail outlets; (2) vitamin and mineral combination preparations sold exclusively by the direct house-to-house method; and (3) vitamin concentrates, whether or not packaged with minerals, sold through all types of outlets. The Commission decided that each of these commercial areas constituted a separate market or line of commerce within the meaning of section 3.

Let us assume as factually correct that competitors may easily obtain distributors other than those tied exclusively to petitioners. Nevertheless, we think the Commission is entitled to view the situation as it exists. By its exclusive-dealing contracts petitioners have pre-empted for themselves some 80,700 outlets throughout the United States. In this manner they control for their product, as we have said, using 1958 figures, 61.52 per cent, or 34.6 per cent, or 8.6 per cent, of the market, depending upon which of the three lines of commerce is considered. Petitioners thus control a substantial share of each line of commerce. The exclusion of competitors from using these same marketing outlets creates a situation which justifies the Commission in finding a substantial lessening of competition. If these distributors were permitted to market products which were competitive with Nutrilite, clearly competition would be substantially increased. In any event it is very reasonable for the Commission so to conclude.

■ In determining whether there has been a substantial lessening of competition "it is not necessary to show the actual impact which a * * * contract has on competition, but * * * it is sufficient if it possesses the potentiality to impede a substantial amount of competitive activity." Anchor Serum Co. v. Federal Trade Comm., 217 F.2d 867, 872 (7th Cir. 1954).

It is true that between 1951 and 1958 Nutrilite's share of the market gradually declined, so that competition may have increased during that period; but it does not follow that the Commission is thereby precluded from finding on the record before it that the exclusive-dealing contract lessened this decline. See Dictograph Products v. Federal Trade Comm., 217 F.2d 821, 824–825 (2d Cir. 1954), cert. denied, 349 U.S. 940, 75 S.Ct. 784, 99 L. Ed. 1268.

■ Turning to the Supreme Court decisions [4] the chief reliance of the Commission is on Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L. Ed. 1371, where it is said:

"The issue before us, therefore, is whether the requirement of showing that the effect of the agreements 'may be to substantially lessen competition' may be met simply by proof that a substantial portion of commerce is affected or whether it must also be demonstrated that competitive activity has actually diminished or probably will diminish."

337 U.S. at 299, 69 S.Ct. at 1055.

This opinion, rendered in 1949, reviews all prior Supreme Court decisions interpreting section 3 of the Clayton Act. It notes that the case of Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653, settled that section 3 "condemns sales or agreements where the effect of such sale or contract of sale 'may' be to substantially lessen competition or tend to create monopoly" though the "mere possibility" of lessening competition is not prohibited. "It was intended to prevent such agreements as would under the circumstances disclosed probably lessen competition, or

---

4. We must rely upon the principles the decisions set forth rather than upon their factual similarity to the present case.

create an actual tendency to monopoly." 337 U.S. at 300, 69 S.Ct. at 1056. The Court also referred to Federal Trade Comm. v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196, and after an extended review of other cases, concluded,

> "the qualifying clause of § 3 is satisfied by proof that competition has been foreclosed in a substantial share of the line of commerce affected."

337 U.S. at 314, 69 S.Ct. at 1062.

█ Thus, as we have indicated, the Commission is not required to find that the market is "foreclosed" by the exclusive-dealing contract; the test rather is whether there is foreclosure "in a substantial share of the line of commerce affected," a test which, for the reasons we have outlined, the Commission was warranted in concluding was satisfied in this case. See Anchor Serum Co. v. Federal Trade Comm., supra, 217 F.2d at 872.

There is of course a difference between petitioners' house-to-house direct-selling methods and Standard Oil's marketing through service stations. The latter are not so easily established as are outlets for Nutrilite or competitive products. But the problem is whether, considering petitioners' share of the relevant lines of commerce, competition in those lines has probably been substantially lessened as a result of the exclusive-dealing arrangements which preclude petitioners' distributors from marketing a product competitive to Nutrilite.

Petitioners rely upon Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 81 S. Ct. 623, 5 L.Ed.2d 580. But that case is quite different; for the Court pointed out that the challenged exclusive-requirement contract pre-empted only .77 per cent of the competitive market, which was found to be quite insubstantial. This is to be contrasted with either 61.52 per cent, or 34.6 per cent, or 8.6 per cent, depending upon which line of commerce is considered.

█ We conclude that the Commission must be sustained in holding that the exclusive-dealing contracts violated section 3 of the Clayton Act and section 5 of the Federal Trade Commission Act.

We come to the findings of two other violations of section 5 of the Federal Trade Commission Act. The first is with respect to the restrictive two-year provision, set forth below.[5]

██ We are not faced with an isolated restrictive two-year clause in a contract between one who purchases the business of another and seeks to protect himself from the competition of the seller for a reasonable period of time. Here the contractual arrangement is with thousands of independent dealers in a nationwide interstate market subject to public regulation under the standards of section 5 of the Federal Trade Commission Act. What is an unfair method or practice within the contemplation of this section is a matter of judgment, in the determination of which weight must be given to the expert judgment of the Commission. See Federal Trade Comm. v. R. F. Keppel & Bros., 291 U.S. 304, 314, 54 S.Ct. 423, 78 L.Ed. 814. That judgment we think has been validly exercised in respect of this restrictive contract. Unless the two-year clause is eliminated as unfair under section 5 of the Federal Trade Commission Act, then elimination of the exclusive-dealing provision under section 3 of the Clayton Act would be largely nullified, for none of petitioners' distributors, though released from the exclusive-dealing provision, could for two years sell to any Nutrilite customer a

---

5. "I agree that for a period of two years following the termination of my relationship with Mytinger & Casselberry, Inc., I will not use or disclose to any person whomsoever any information I obtained while I was a Nutrilite Distributor concerning the names and/or addresses of Nutrilite customers, or any other trade secrets, nor will I, on my own behalf, or on behalf of any other person solicit or in any manner attempt to induce Nutrilite customers to purchase any other vitamin and/or mineral product or to cease using Nutrilite Food Supplement."

product competitive to Nutrilite. This would considerably weaken the remedy required for the Clayton Act violation. Though legally freed of the exclusive-dealing contract the distributor would not be truly freed. He would still be substantially tied to petitioners as an exclusive distributor of their product. It seems to us the Commission's judgment as to the unfairness of this, in view of the congressional policy to promote free competition, is a reasonable one. A large part of the market is in petitioners' hands. If as a practical matter their thousands of dealers have only a limited opportunity to sell in the available market for two years then they are not likely to terminate their arrangement with petitioners and obtain the reasonable freedom our system of competition should afford.

We turn to the final violation of section 5, as found by the Commission. The corporate petitioner and its agents were sued by the Food and Drug Administration in the District Court for the Southern District of California. The complaint alleged that Nutrilite was misbranded within the meaning of section 502(a) and section 502(f) (1) of the Federal Food, Drug, and Cosmetic Act.[6] The suit followed a number of seizures of Nutrilite made by the Food and Drug Administration based upon allegations of misbranding and the use of allegedly misleading literature in connection with the sale of Nutrilite. Criminal proceedings by the United States against the corporation had also been initiated. These proceedings had been preceded in 1949 by injunction litigation initiated by the corporation in the District Court for the District of Columbia against the Federal Security Administrator and officials of the Food and Drug Administration claiming that the seizures were arbitrary and illegal.

The suit filed by the United States in the Southern District of California set forth the charges in the seizure and criminal cases regarding various alleged misrepresentations with respect to Nutrilite's curative qualities and .the like. The suit was disposed of by a consent decree dated April 6, 1951. It ordered the corporation to refrain from distributing Nutrilite accompanied by specified articles, books, pamphlets and a motion picture, or matter which implied that it would be an effective cure for approximately fifty-four specified diseases or conditions, and from making other specific representations in writing, printing or graphic matter in promoting the sale of Nutrilite. The decree set forth certain allowable claims which might be made as to the need for or usefulness of Nutrilite and stated that petitioners could submit to the Food and Drug Administration for inspection and comment, written, printed or graphic matter to be used in the future merchandising of Nutrilite. The criminal and libel proceedings were terminated on stipulation.

In the present proceedings the Commission charged that the petitioners had been misrepresenting the consent decree in the following respects: (1) that it amounted to an endorsement or approval of Nutrilite by the United States Government, the United States District Court, and the Food and Drug Administration; (2) that the allowable claims set forth in the decree referred only to Nutrilite and to no other vitamin-mineral supplement; and (3) that no other seller of vitamin or mineral food supplements had a right to submit its promotional literature to the Food and Drug Administration for inspection and comment. The Commission set forth in its opinion a number of instances proved on the record in support of the charges of misrepresentations.

We set forth in the margin a memorandum of the petitioners sent to their distributors.[7] Another illustration is a pamphlet describing the consent decree

---

6. 52 Stat. 1050, 1051 (1938), as amended, 21 U.S.C. § 352(a), (f) (1) (1958), 21 U.S.C.A. § 352(a), (f) (1).

7. "You can be proud and confident as you present the 'facts' about vitamins and

minerals as set forth in the Consent Decree. 'Proud' because none of your competitors has such a document, and 'confident' because it bears the approval of a Judge of the United States District

as a tribute for which petitioners "are sincerely grateful for the right to say that for the first time we really 'know where we are going'!" Other literature described the decree as one of the strongest sales tools a Nutrilite distributor could use, an official document bearing the signatures of officers of the federal government, thereby supporting the claims made for the product.

■ On the basis of ample evidence the findings of the Commission on this branch of the case are sustained. These include findings, contrary to petitioners' representations and inferences sought to be created, that the consent decree is an injunction restraining the corporate petitioners from making various representations in connection with the sale of Nutrilite which had been alleged in the court proceedings to be false and deceptive, and is a corrective measure taken by the court to abate and prevent repetition of alleged wrong-doing by petitioners. Those we sustain also include findings that the petitioners created the false impression that as a result of the decree they alone, and no other seller of vitamin and mineral products, had the right to submit their advertising and promotional literature to the Food and Drug Administration for comment in advance of publication, a privilege which, the Commission points out, was available prior to entry of the decree.[8]

■ On the basis of the Commission's findings, which were initially made by the Hearing Examiner and thereafter adopted by the Commission, we are of the opinion that the provisions of the order, with the one modification as made by the Commission, must in all respects be affirmed.

■ We note petitioners' objection to the provisions of the order which prohibit representations that the consent decree is anything other than an injunction which prohibits, restrains, or limits petitioners' advertising practices. It is argued that this language may be construed to prevent any reference to the provisions of the decree regarding allowable claims, or indeed any statement whatever about the decree. In its opinion, however, the Commission meets the objection by construing these provisions as not forbidding references in petitioners' advertising to allowable claims in the event statements in that regard are not made in word settings which imply that the decree operates to confer on petitioners rights to make such claims to the exclusion of others. The opinion further states that under the order petitioners' rights to truthful and non-deceptive explanation and discussion of the provisions of the decree in their advertising are fully protected.

The petition to set aside the cease and desist order of the Commission will be denied, and enforcement of the order of the Commission is .

Ordered.

BURGER, Circuit Judge (concurring in part and dissenting in part).

I cannot agree with the majority that because Nutrilite has exclusive dealing contracts with 80,000 sales people across the nation, many of them part time, that there has been a foreclosure of competition in a substantial share of the line of commerce affected. Moreover I suggest that the conclusion of the majority represents a drastic and major extension of the

---

court. * * * The Decree is a valuable selling tool."

8. In determining what constitutes a deceptive act or practice under section 5 of the Federal Trade Commission Act it has been held that,
  "The meaning of advertisements or other representations to the public, and

their tendency or capacity to mislead or deceive, are questions of fact to be determined by the Commission and should be upheld by a reviewing Court unless arbitrary or clearly wrong."
Kalwajtys v. Federal Trade Comm., 237 F.2d 654, 656, 65 A.L.R.2d 220 (7th Cir. 1956), cert. denied, 352 U.S. 1025, 77 S. Ct. 591, 1 L.Ed.2d 597.

force and effect of Sec. 3 of the Clayton Act beyond any prior decisions of the Supreme Court. We need not always await Supreme Court action but where the consequence of an extension or enlargement of a Supreme Court doctrine is so immediate and far reaching and so oppressive on an established mode of business I think we ought to let that Court speak first.

First, I find it oppressively arbitrary to carve out from the entire retail sales market of multi-vitamin and mineral food supplements that relatively minor sector constituted of door-to-door (or direct) sales, and to assess Nutrilite's competitive impact on the total, relative to other companies, on the basis of a 1958 statistic that in the "direct sale market" it "controlled" 61.5% of the retail outlets, in the sense that 61.5% is roughly three-fifths of the *persons* who sold door-to-door. In the *entire* retail market for such nutritional supplements, that is all points or places where a consumer can readily buy them, including fixed outlets such as pharmacies, drug and department stores, food and supermarkets, industrial sales and variety stores, and by mail order, Nutrilite controls only 8.6% of the retail outlets. The Supreme Court has said that the "area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which *the purchaser can practically turn for supplies.* * * *" Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L. Ed.2d 580 (1961). (Emphasis added.) There is nothing to demonstrate that the consuming public cannot "practically turn for supplies" of this item to the fixed retail outlets which are readily available to all consumers, at least as easily as they can purchase from door-to-door salesmen. For this reason I am unable to see how the "line of commerce" affected by Nutrilite's exclusive contracts with its salespeople can reasonably be limited to the door-to-door market. I would therefore evaluate the Nutrilite undertaking on the basis of its control of the *total* of all the readily available sources which is 8.6%, not 61.5% of the market affected.

However, in either case, I think the majority is incorrect in finding foreclosure of competition "in a substantial share of the line of commerce affected." The peculiar and potentially universal attraction of the product here involved, considered together with the minimal investment or training necessary to market it, compels me to conclude that the Standard Oil and Dictograph cases relied on by the majority are not controlling. To enter the door-to-door distribution of these products one needs no more than time, a willingness to push doorbells and a pair of stout shoes.

In the Standard Oil case the Court dealt with a situation in which the retail outlets were gasoline stations which are very expensive to establish. The establishment of expensive additional outlets by potential competitors would have been economically infeasible in view of the natural limit on the consumer demand for the product in any particular area where the outlet was situated and immobile. Similarly, in the Dictograph case the retail marketing of hearing aids required the establishment and maintenance of costly retail outlets as well as a considerable degree of specialized salesman training in the art of accommodating individual customer needs, servicing facilities, etc. Moreover, the Dictograph consumer market was limited to only that sector of the public willing to acknowledge a hearing impairment. Additionally in both the Standard Oil and Dictograph cases the retailers under exclusive contract were presumably in the particular narrow line of commerce on a full time basis.

Comparing the characteristics of the Standard Oil and Dictograph type busi-

nesses with those of Nutrilite, marked distinctions at once emerge which in my view establish that there is no foreclosure of competition in a substantial share of the affected line of commerce. Nutrilite products, as I have suggested, can be sold, literally, by anyone who can walk, talk and carry a supply of merchandise after reading a sales manual. Indeed they can be distributed by the ubiquitous vending machine. The capital overhead for a person desiring to sell the product is so small as to be inconsequential. Inventory requirements are very limited. The business of selling can be and usually is carried on part time, day or night. And the measure of the market—the consuming public likely to buy Nutrilite or similar products—is determined by the latest census.

All these factors facilitate entry into the retail market by an almost unlimited number of door-to-door distributors, so that the fact that Nutrilite recently had 80,000 or more persons under exclusive contract is relatively meaningless. The potential door-to-door entrepreneurs include retired men and women, school teachers, housewives, college students, and "moonlighters" who want to earn extra money. This conclusion is strengthened if I am correct in believing that the relevant "line of commerce" includes, as it must in common sense, the numerous fixed retail outlets for these vitamin supplements which I have mentioned. I conclude therefore that Nutrilite's operation is sufficiently different from those which have previously confronted the courts as to invalidate a determination, based on percentage of the current market, that its contracts "may * * * substantially lessen competition." I would reverse the Commission on this point. As to the restrictive two year provision and Nutrilite's use of the consent decree, I am in accord with the majority.