**Michael LEPORE and Vito Lepore,
Plaintiffs,**

**v.**

**NEW YORK NEWS INC., Defendant.**

**No. 72 Civ. 2024.**

United States District Court,
S. D. New York.

July 20, 1972.

Motion to Reargue Aug. 21, 1972.

White & Coch, P. C., New York City, for plaintiffs; by Nicholas L. Coch, New York City, of counsel.

Townley, Updike, Carter & Rodgers, New York City, for defendant; by Andrew L. Hughes, Philip D. Pakula, Michael S. Belohlavek, New York City, of counsel.

GURFEIN, District Judge.

This is an action by Michael Lepore and Vito Lepore, independent home delivery dealers of the Daily News and the Sunday News, against New York News Inc. ("the News"), the publisher of those two newspapers, for damages under § 4 of the Clayton Act (15 U.S.C. § 15) and for injunctive relief under § 16 of the Clayton Act (15 U.S.C. § 26). The request for relief is based upon alleged violations of § 1 of the Sherman Act (15 U.S.C. § 1) and §§ 3 & 7 of the Clayton Act (15 U.S.C. §§ 14, 18) committed by the defendant in connection with the conduct of its system for the home delivery of the Daily News and the Sunday News.

Plaintiffs move for a preliminary injunction restraining the News from terminating its carrier agreements with the plaintiffs and from committing acts of harassment against the plaintiffs, and mandating other incidental relief. An evidentiary hearing was held.

This action raises some fundamental questions in the field of newspaper delivery.[1] Before 1965, the Daily News and the Sunday News sold their papers to independent route dealers who bought the newspapers from the News and delivered them by use of automobile. The independents carried and sold other morning newspapers in competition with the News, namely, the New York Times ("the Times"), and the now defunct Daily Mirror, Herald Tribune and, in Suffolk County, the Suffolk Sun.[2]

In 1965 the News began a new distribution system, which utilized carrier boys in conjunction with franchised dealers, in certain areas of the suburban metropolitan area. At the same time it continued to deal in the old way with the independents who still distributed other newspapers and who were not limited on

1. See Roberts, Antitrust Problems in the Newspaper Industry, 82 Harv.L.Rev. 319, 325–28 (1968).

2. The News bought the assets of the Mirror in 1963 and the Sun in 1969. The plain-

tiffs allege a violation of § 7 of the Clayton Act in these acquisitions, but it is not necessary to discuss that claim on this motion.

the retail price they could charge. That is still the situation in Manhattan and other areas.

This new distribution system for certain suburban areas involves independent home delivery carriers under uniform carrier agreements. The relevant provisions of the carrier agreement are: (1) that the News agrees to assign an exclusive territory to the carrier which it will assign for home delivery to no other carrier; (2) that the carrier agrees to purchase all newspapers required by home delivery customers at the prices fixed by the News and deliver them "at no more than the *regular established home delivery price*"; (3) that the carrier agrees not to sell or distribute copies of any other newspaper, or any advertising matter not authorized by the News; (4) that the carrier agrees not to charge any carrier boy engaged in making deliveries and collections more than the price established therefor by the News; (5) that the carrier does not have the right to return at cost unsold copies of the News; (6) that the News may terminate the agreement without advance notice if the carrier breaches any of its provisions, but that the carrier must give sixty days' notice in writing; (7) finally, that "the Carrier is and shall remain an independent contractor and not an employee or agent of the News."

In 1966 Michael Lepore ("Michael") entered into a similar carrier agreement for a certain area of Suffolk County (area FS–208) and his brother Vito ("Vito") entered into the same agreement for another area of Suffolk County (FS–209). In 1967 each entered into a revised agreement, the relevant terms of which have already been described. In November 1968, Michael sold his carrier agreement for FS–208, with the consent of the News, to Vito. At the same time, Michael entered into a new carrier agree-

ment for the assigned territory of Co-Op City in the Bronx.[3] He was furnished with 500 free sample newspapers a day for distribution to tenants to acquaint them with the advantages of subscribing to home delivery service. This practice continued, with only a slight suspension, until January 17, 1972, when it was abruptly terminated in circumstances to be related.

The relationship between Michael and the News was apparently good until shortly after May 1971 when Michael shifted from boy deliverers to adult deliverers at higher compensation, because Co-Op City management had imposed a regulation fobidding use of its elevators by deliverers after six o'clock a. m.—too early, under the law, for the use of boy deliverers. As a result, the weekly collections formerly made by the boys themselves could not be made by the adult deliverers, whose income would not justify the extra time; and, therefore, the more costly system of monthly billing by mail had to be instituted. Also, of course, the compensation had to be made higher for adults by dropping the price of the newspapers to the adult deliverers.

To make up for the changed conditions at Co-Op City, Michael joined with his brother, Vito, who did the home delivery at Co-Op City for the Times, to develop a single group of adults to deliver the Daily News and the Sunday News as well as the Times in Co-Op City. In addition, to make up for the added costs of adult delivery and billing by mail, Michael, in or about May 1971, increased his prices by including in his monthly bills to customers an additional charge, denominated a "billing charge."

He took both these actions unilaterally without approval of the defendant, and was in apparent breach of the contractual conditions of the agreement.[4] It is not evident when the News got full knowledge of these breaches, but by

3. Co-op City consists of approximately 15,-000 dwelling units.

4. Plaintiffs claim that Michael was not in contractual breach when, rather than de-

livering the Times himself, he hired a single outside crew that would deliver the Times with the News. We need not pass on that at this time.

January 1972 things began to happen. On about January 17, 1972 the practice of sending free newspapers to Michael for sample distribution was stopped without notice. On January 27, 1972, the News advised Michael that his carrier agreement was terminated because of his use of adult deliverers who also delivered the Times, and because his "billing charge" made his price to customers higher than the maximum price allowed. In response to Michael's plea for reinstatement, the News gave him until February 1 to cease and comply. That deadline was later extended to February 6.

By February 6, Michael had hired a separate group of adult deliverers and, based on a compromise with the News, had dropped the "billing charge" and substituted for it a request for a "voluntary gratuity" in suggested amounts of from eighty-seven to ninety-five cents a month, depending on the number of papers delivered. There was testimony that most boy deliverers had been getting tips of about 25 cents a week but that the adults were receiving practically nothing, since they did not collect the bills and, hence, did not come face-to-face with the customers.

On February 23, 1972 the News placed vending machines for the sale of its newspapers on the street near various entrances to Co-Op City buildings. Early in March, the News cancelled a separate oral contract which both plaintiffs had had with the News since 1968 for telephone solicitation of subscriptions for home delivery of the Daily News and the Sunday News in Suffolk County. There is no doubt that by this time there was bad blood between the News and the Lepores. The Lepores call the acts described "reprisals;" the circulation sales manager of the News swore that they were dictated by economic considerations. No special reprisal against Vito, unrelated to Michael (nor, indeed, any breach of the carrier

agreements by Vito in Suffolk County), has been shown.

The plaintiffs contend that they have demonstrated *prima facie* violations of the antitrust laws by the News entitling them to preliminary relief and that, in any event, the balance of hardship is so strongly in their favor as to require immediate relief.

The defendant admits that it sells over 2,225,000 daily morning newspapers and over 3,000,000 Sunday newspapers in the metropolitan New York area.[5] Whether or not this constitutes about 70% of the total circulation of all daily and Sunday newspapers in the area, as plaintiffs allege, it is clear that the News has the dominant position in the morning field, and that its sole competitor has been the Times since the passing of the Mirror, the Herald Tribune and the Suffolk Sun.

The plaintiffs contend, *inter alia,* that it is illegal: (1) under Sherman Act § 1 and Clayton Act § 3 for the News to require a carrier to agree not to deliver a competitor newspaper; (2) under Sherman Act § 1 to fix a maximum price for resale of its papers; and (3) under Sherman Act § 1 to restrict the territory in which the carrier may resell the newspapers. The News does not deny that it imposes the first two of these restrictions but urges that each is lawful. It also admits it is engaged in interstate commerce.

■ Though Michael may have given the defendant a contractual basis for terminating the carrier agreement respecting Co-Op City, that does not dictate a denial of injunctive relief to the plaintiffs. "The public interest in encouraging antitrust prosecutions by private parties (Hanover Shoe, Inc. v. United Shoe Mach. Co., 392 U.S. 481, 494, 88 S.Ct. 2224, 20 L.Ed.2d 1231 . . . (1968)) and the need for such parties to continue in their businesses while the legal claims are tried have per-

5. This area is defined as New York City, the surrounding areas of New York, Connecticut and New Jersey within a radius of fifty miles from the City, all of Suffolk County, parts of Dutchess and Ulster Counties in New York, and parts of Fairfield, Litchfield and New Haven Counties in Connecticut.

suaded courts to restrain terminations pendente lite." Milsen Co. v. Southland Corp., 454 F.2d 363, 366–367 (7 Cir. 1971). This Circuit has laid it down that where the balance of hardship tips decidedly toward the plaintiff, it is not necessary for preliminary relief that he has demonstrated a likelihood of success but only that he "has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2 Cir. 1953). This test was recently reaffirmed, Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205–1206 (2 Cir. 1970).

## I

We, therefore, turn to examine the antitrust violations alleged in the light of the test to be applied in this Circuit. The evidentiary hearing established, except for the question of reprisals, that the parties were in agreement on the events that had occurred.[6] The issues raised are largely questions of law. It is unnecessary at this stage of the litigation to determine the merits. That will remain for the trial. Here we explore the state of the law and the balance of hardships.

### Standing

■ The plaintiffs have standing to raise the antitrust questions. See Bales v. Kansas City Star Co., 336 F.2d 439, 444 (8 Cir. 1964). There it was specifically held that newspaper distributors had standing to attack conditions requiring them not to deal in newspapers of competitors and, accordingly, to sue the Kansas City Star for alleged violation of § 3 of the Clayton Act. The Court rejected the contention that only newspapers in competition with the Star had standing to sue.

### The Agreement Not to Carry Competitors' Newspapers

The District of Columbia Court of Appeals has held that a contract providing that door-to-door canvassers could not sell competitors' products was in violation of § 3 of the Clayton Act where the petitioner's product accounted for 61.52% of all direct house-to-house sales of vitamin concentrates. The Court emphasized that the distributors, as is also the case here, were not employees of the petitioner but were independent business enterprises. Mytinger & Casselberry, Inc. v. F.T.C., 112 U.S.App.D.C. 210, 301 F.2d 534 (1962). The Court of Appeals relied upon Standard Oil Co. of California v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949), for the point that illegality may be shown where the effect "may be" to lessen competition substantially.[7] See also Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

In *Bales, supra,* the Court intimated that, while the complaint could not be dismissed summarily, the Kansas City Star might prove at trial that it did not intend restraint of commerce in news but that its only concern was the timely and efficient distribution of its newspapers. At trial the News can do likewise, provided the trial court agrees that this is a relevant consideration; and, of course, the News may also attempt to prove that competition is not lessened substantially by its exclusive dealing provision.

We are still at the threshold of decision concerning the legality under the Clayton Act of the News' contract restriction on distributing the newspapers

---

6. On March 9, 1972, defendant's circulation sales manager Rosenburgh sent Michael a letter stating: "I certainly trust that the conditions in the Co-Op City Franchise will remain satisfactory and that these violations will not be repeated or new ones initiated." All agree that those "violations" were delivering the Times and adding a billing charge to the maximum price permitted.

7. Circuit Judge Burger (now the Chief Justice), in dissent, distinguished the *Standard Oil* case on the ground that it was expensive for potential competitors to erect gasoline stations but that anyone with stout feet could sell door-to-door.

of competitors, actual or potential. But we can surely say that the plaintiffs have raised substantial and difficult questions which are a fair ground for litigation.

### Maximum Price Restriction

The plaintiffs contend that the maximum price restriction on the home delivery price is unlawful under § 1 of the Sherman Act. The Supreme Court in Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), held that there was an unlawful combination in violation of § 1 where the St. Louis Globe-Democrat, having imposed a maximum price for home delivery on a carrier, agreed to allow others to compete for his customers after the carrier began to sell at higher than the maximum price. The combination charged to have been in restraint of trade was between the defendant publisher and "plaintiff's customers and/or" the distributing agencies brought into competition with the plaintiff. The Court divided sharply on the issue of whether maximum prices, like minimum prices, are illegal *per se*. The Court divided, moreover, on the question pertinent here, whether the plaintiff could have alleged a combination between the publisher and himself in restraint of trade so long as he unwillingly complied with the maximum price. The majority (*id.* at 150 n. 6, 88 S.Ct. 869) thought that he could under the doctrine of United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed. 2d 505 (1960).

Furthermore, the *Albrecht* majority (390 U.S. at 152 n. 8, 88 S.Ct. 869) rejected the view that only *combinations of suppliers* to fix maximum prices violated the Sherman Act, refusing to accept that reading of Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), made by Mr. Justice Harlan in dissent. It is un-

likely, then, that we are still left with the dictum in *Kiefer-Stewart* that "Seagram and Calvert acting individually perhaps might have refused to deal with petitioner or with any or all of the Indiana wholesalers." 340 U.S. at 214, 71 S.Ct. at 261.

We must conclude, however, that there is still some doubt whether a unilateral fixing of maximum prices without any combination except with the plaintiff is always a violation of § 1 of the Sherman Act. But surely, at this moment in the history of Sherman Act § 1, it is fair ground for litigation.

The News contends that its conduct in setting maximum resale prices was lawful, in any event, because of the exemptions of the McGuire Act, 15 U.S.C. § 45, and of the Feld-Crawford Act, N.Y. Gen.Bus.Law, McKinney's Consol. Laws, c. 20, § 369–a, for fair-traded commodities. There is a question here whether the News is in "free and open competition with" other papers in the plaintiffs' territories, as those two Acts require. But cf. Eastman Kodak Co. v. Home Utilities Co., 234 F.2d 766, 770–771 (4 Cir. 1966), appeal dismissed, 352 U.S. 956, 77 S.Ct. 349, 1 L.Ed.2d 363 (1957). Another issue here is whether and to what extent the News acts as a competitive wholesaler in selling directly to newsstands, to vending machine dealers and to adult and boy deliverers, and as a retailer in selling through mail subscriptions.[8] In United States v. McKesson & Robbins, Inc., 351 U.S. 305, 316, 76 S.Ct. 937, 100 L.Ed. 1209 (1956), the Court gave a restrictive meaning to the McGuire Act exemption, finding that a manufacturer who also was a competitor-wholesaler could not legally fix wholesale prices on its branded products. But it is not certain whether the gloss of *McKesson & Robbins* on the McGuire Act exemption applies to price *ceilings*, as

---

8. The News reserved the right in the carrier agreement to supply home subscribers in the territory by mail. While it was not established how many papers, if any, the News sold in the territory by mail subscription, the holding out of the supplier as a retailer, even if ineffectual, may deprive him of the McGuire Act exemption. See AR–EX Products Co. v. Capital Vitamin & Cosmetic Corp., 351 F.2d 938 (1 Cir. 1965).

well as price floors. The question of whether the News comes within the exemption is probably fair ground for litigation and turns, in part, on questions of fact to be reserved for trial on the merits. See Janel Sales Corp. v. Lanvin Parfums, Inc., 396 F.2d 398 (2 Cir.), cert. denied, 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275 (1968). Whether or not the provision for maximum prices, in light of the fair trade laws, could *alone* support preliminary relief need not be decided, however, because of the existence of the other provisions discussed involving exclusive dealing and territorial allocation.

### The Agreement Not to Sell Outside the Assigned Territory

■ I find that by inference from the exclusive territory provision of the carrier agreements, the plaintiffs have not been permitted to sell the News outside their own territories. This is a *per se* violation of § 1 of the Sherman Act. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). Even without any price-fixing scheme, "where a manufacturer *sells* products to his distributor subject to territorial restrictions upon resale, a *per se* violation of the Sherman Act results."[9] 388 U.S. at 379, 87 S.Ct. at 1865.

### II

■ On a balance of hardships, the Court finds that the News will lose relatively little and Michael relatively much if he is forced to close his business, and that he must close his business if the News cuts him off as a carrier. It might have been better for the News to have resolved its differences with Michael at Co-Op City by reducing the price to him

because of the new conditions of newspaper delivery in that territory, or by giving him the newspaper vending concession. But the News has chosen, in its business judgment, to stand upon its supposed rights.

The News will be enjoined from terminating Michael's carrier agreement or stopping deliveries of its newspapers to him, *pendente lite*, even if he also delivers the Times or other newspapers with the News and even if he charges a "billing charge" not to exceed eighty-seven cents to ninety-five cents a month depending on the number of papers delivered.[10] Cf. Milsen Co., *supra*, 454 F. 2d at 369; Interphoto Corp. v. Minolta Corp., 417 F.2d 621, 622 (2 Cir. 1969).

The Court finds that the use of vending machines in the area of Co-Op City was in the nature of a reprisal, and the News will be ordered either to abandon the vending machine distribution or turn it over to Michael as distributor, *pendente lite*. The News will also be ordered, *pendente lite*, to provide 500 free sample newspapers per day, as in the past, for Co-Op City.

While in the case of Michael interim relief is necessary because of the threats to terminate his carrier agreement and because of the economic hardship growing out of the changed conditions of newspaper delivery in Co-Op City, there is no such threat and no such change of economic condition in the case of Vito. Interim relief is, therefore, limited to Michael's business in Co-Op City, and interim relief is not granted in favor of Vito. The News would be foolhardy, of course, in the light of this opinion to terminate Vito as a reprisal against the Lepores. If conditions change before trial, any party may apply for further relief at the foot of the decree.

9. The same may be true with regard to the News' restrictions on the type of plaintiffs' customers, *viz.*, the prohibition of reselling newspapers purchased from the News to anyone other than by or for home delivery.

10. The Court is limiting the price, *pendente lite*, being mindful of Mr. Justice

Stewart's dissent in *Albrecht, supra,* that the home delivery carrier of the newspaper is a monopolist of home delivery. If exclusive territories should later be prohibited, adjacent carriers may then supply competition.

Finally, since it is not clear that the cancellation of the Lepores' telephone solicitation program was a reprisal rather than an economic measure dictated solely by self-interest, the News will not be required to restore the oral contract *pendente lite*. All other relief requested in the notice of motion filed May 24, 1972 is likewise denied.

The parties should apply for an expedited trial.

The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

Settle order on five days' notice.

## MOTION TO REARGUE

This is a motion by the defendant to reargue the granting of a preliminary injunction in an opinion filed July 20, 1972. That motion is granted, but I see no need for oral argument or for further affidavits. See Local General Rule 9(m).

■ The defendant is concerned that the relief I contemplate exceeds its concept of maintaining the *status quo*. However, defining what is the *status quo* in this situation is difficult, in view of the need to eliminate what have been found to be reprisals and the dispute as to what was actually the last non-contested status of the parties. And even assuming that the relief does alter the *status quo*, it is proper because Michael Lepore had made a sufficient showing of potential irreparable harm. See Flood v. Kuhn, 309 F.Supp. 793, 799 & n. 20 (S.D.N.Y.1970). I previously cited examples of similar cases in which the Court ordered or suggested relief altering the *status quo*.*

Accordingly, I adhere to my previous decision regarding delivery of the Times by Michael and the imposition of a mandatory billing charge. Likewise, I still expect the News to provide 500 sample newspapers per day, to be used as free samples by Michael. Furthermore, this relief is not to be accompanied by any self-decreed divergences from the *status quo* by the News; I refer specifically to its threat to increase its charge to Michael to the "standard dealer price."

A reconsideration of the balance of interests, *pendente lite*, including the public interest and the interest of Brinkman, the automatic vending machine distributor, prompts me to withdraw that aspect of the relief that dealt with the vending machines in Co-Op City.

Settle order on five days' notice. That order should make provision for a bond in an amount to be determined on settlement of the order, Fed.R.Civ.P. 65(c). Written suggestions of the amount of the bond will be considered.

* See authorities cited at the bottom of page 761 of the July 20, 1972 opinion.