Samuel A. MANNIS, an individual trading as Samuel A. Mannis and Company, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 16870.

United States Court of Appeals Ninth Circuit.

Aug. 28, 1961.

Jerome Weber and Benjamin Held by Benjamin Held, Los Angeles, Cal., for petitioner.

James McI. Henderson, Gen. Counsel for Federal Trade Comm., Alan B. Hobbes, Asst. Gen. Counsel and Miles J. Brown, Washington, D. C., for respondent.

Before BARNES, JERTBERG and MERRILL, Circuit Judges.

BARNES, Circuit Judge.

This case arises as a petition to review an order of the Federal Trade Commission (15 U.S.C.A. § 45(c) ) requiring petitioner to cease and desist from certain violations of the Fur Products Labeling Act (15 U.S.C.A. § 69). This court has jurisdiction under 15 U.S.C.A. § 45(c) and (d).

Petitioner's business, located in Hollywood, California, consists of the retail selling of fur garments. An investigation of petitioner's business by the FTC

revealed that petitioner had in many ways violated the Fur Products Labeling Act. An initial decision in the case was rendered by a hearing examiner and an appeal to the Commission was taken by both sides. The Commission issued an extensive cease and desist order proscribing the numerous violations which petitioner had committed. On this appeal petitioner attacks only a small segment of the order. No useful purpose can be served by including a résumé of the entire order.

1. Did petitioner issue false invoices in violation of the Act?

Respondent's counsel put in evidence a number of invoices which do not conform to the requirements established by 15 U.S.C.A. § 69c(b). At least one of the violations alleged was quite far-fetched (muskrat was inadvertently spelled "mustrak"). Other asserted violations are hypertechnical (e. g., "Natural Breath of Spring Stole" does not, in the Commission's eyes, indicate that the animal producing the fur is a mink). Many of the more substantial violations relate to "temporary invoices." As to these, it was not clear whether they had ever been "replaced" by regular invoices containing the required information. The trial examiner, considering the nature of the defects and their number in comparison with the amount of business done by petitioner, determined that there was no "substantial proof of false invoicing." (Record, p. 29.)

The Commission did not agree with the trial examiner. It held that a defective invoice, whether "temporary" or "permanent," still violated the Act. The Commission found that the invoices presented in support of the false invoicing charge were, in fact, defective and did, therefore violate the Act. The Commission agreed that *some* of the violations were technical, but held that such violations still constitute false invoicing within the meaning of the Act.

■■■■ It cannot be said that the Commission's decision is unsupported by substantial evidence. There are a number of invoices in evidence; it is undisputed they do not come up to the standard set by the Act. Petitioner urges, however, that this court *cannot* find substantial evidence in support of the Commission's ruling in view of the Hearing Commissioner's contrary determination. Universal Camera Corporation v. N.L.R.B., 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456. Petitioner's position in our opinion strains the language of the Universal Camera case beyond its limits. Furthermore, the Hearing Commissioner's initial determination, under the facts of this case, is not entitled to particularly great weight on the "invoice issue" now before us. Here the evidence (viz. the invoices) is of a documentary nature. It was before the Commission in precisely the same way it was before the trial examiner. Much of that evidence was disregarded by the trial examiner because of what the Commission found to be a mistake of law with respect to the legal nature of "temporary" invoices. While petitioner's discussion of the invoices continues to categorize them as "permanent" or "temporary," petitioner does not attempt to counter the Commission's assertion that there is no legal difference between the two kinds of documents. We are required to read § 2(f), 65 Stat. 175, "hospitably" with a view to protecting retail purchasers against improper invoicing. For purposes of this appeal then, we assume that the Commission's position is correct. F. T. C. v. Mandel Brothers, 1959, 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893.[1]

In short, there is substantial evidence to support the Commission's decision. Any doubt created by the fact that the hearing examiner arrived at a different

1. Petitioner failed to present argument (5 C.J.S. Appeal and Error § 1324(2) p. 334) and authority (Gilbert v. United States, 9 Cir., 1961, 291 F.2d 586, to the contrary. If the matter must be decided upon its merits, it would still seem that the construction rendered by the Commission is correct, under the interpretation placed upon the language in the Mandel case.

conclusion is dissipated by the error of law (drawing a distinction between temporary and permanent invoices) which infected the hearing examiner's consideration of the evidence.

2. Did petitioner advertise second-hand furs without identifying them as such? (15 U.S.C.A. § 69c(a) (2).)

In the July 14, 1957, issue of the Los Angeles Times newspaper petitioner advertised "Mink stoles, scarfs—$99 and up" and listed "Ranch Mink Coats" at "$598." No reference to "second hand or used" fur appears. A Commission investigator took the advertisement to petitioner's place of business and asked of the manager (A. A. Weiss) to see one of the "Ranch Mink Coats." The one produced was a used garment. The investigator, testifying from notes, claimed that Weiss told him there were no new $598 Ranch Mink Coats in stock. Weiss, testifying from memory, denied this. The examiner believed the Commission investigator.

■ Petitioner urges that in view of the conflict of testimony this single incident is inadequate evidence to support the issuance of a cease and desist order. The Commission, of course, had the right to assess the credibility of witnesses and to make a decision upon the evidence so evaluated. While the evidence is not overwhelming, it is sufficient to establish that there was a violation of the Act. There is, further, corroborative evidence. Though petitioner advertised mink pieces for $99, he could produce no proof of any sale of a new mink piece made at that price.

We do not find the evidence supporting the Commission's decision on this issue to be insubstantial. If the investigator's testimony is believed, it clearly appears that petitioner's advertisement did "not show that the fur [was] used fur or * * * contain[ed] used fur, when such [was] the fact." (15 U.S.C.A. § 69c(a) (2).)

■ 3. Did petitioner violate 15 U.S. C.A. § 69c(a) (5) by advertising he had "thousands of furs to choose from," thus constituting "a[ny] form of misrepresentation or deception"?

While petitioner was advertising that he had "thousands of furs to choose from," his inventory in one instance did not exceed 1,541 furs and at another time did not exceed 1,263. The trial examiner viewed this aspect of the case with indulgence. Petitioner's inventory necessarily varied from time to time. The advertising was, in the examiner's eyes, mere puffing. The Commission was more strict. Any number of furs less than 2,000 cannot be described as "thousands"; the advertising thus violated the terms of the statute.

Petitioner contends that no violation of 15 U.S.C.A. § 69c(a) (5) is established unless the Commission proves that "the advertising * * * has the capacity to mislead the public into buying [the] product in the belief that it is acquiring one essentially different." (Brief, p. 29). But we think that petitioner's advertising has this capacity. We agree with respondent in its assertion that petitioner's advertising is designed "to convey the idea that a myriad of items are waiting to be moved from stock at reduced prices [and] to give the impression of a distress sale of all manner of desirable goods and thus the opportunity for making a better selection."

■ The purpose of the Act is the protection of consumers against false advertising. F. T. C. v. Mandel Brothers, supra, 359 U.S. at page 388, 79 S.Ct. at page 822. It places an affirmative burden on a fur seller to state the truth respecting his furs offered for sale. We think that the Commission's interpretation of the law is a valid way of attaining this objective; even though it is not a way this court or its individual members might have selected had they been the one charged with initiating this action.

■ 4. Did petitioner's offer of "bonded appraisals" constitute false advertising?

As part of his advertising, petitioner frequently included the offer of "written bonded appraisals with all furs." The

hearing examiner found that the appraisals given were not bona fide and that the advertising offering them had the capacity to deceive the customer. Accordingly the cease and desist order prohibits petitioner from placing advertisements which use the term "written bonded appraisals" (or similar language), unless the appraisals rendered are given by qualified and disinterested appraisers. We note that the order relates to advertisements only; it does not prohibit any appraisals.

There is no evidence (petitioner asserts) that any appraisal could have induced a purchase, for admittedly the appraisals were not given until *after* the purchase had been made. (Record, p. 40.) This contention overlooks the fact that salesmen frequently intimated, or openly stated, what the appraised value would be. Robert Schnebly, when purchasing a fur for his wife, asked what the appraised value would be and he was told that the fur would be appraised at $1,490 (a figure greatly in excess of the purchase price of $995). (Record, pp. 146, 203.) The purpose of such representations could well only have been to induce a sale. In an attempt to discredit this evidence, petitioner describes Schnebly's testimony as being garbled, and therefore entitled to no weight. We agree that Schnebly's testimony is not perfectly lucid in every respect, but it is clear and unequivocal on the point relevant here. Petitioner also asserts that Schnebly, rather than seeking to rescind the transaction, affirmatively desires to complete it. We find no evidence on this point except the witness's statement that he believes the sale to have been completed "legally speaking" (Record, p. 148). This indicates at most that Schnebly feels he cannot now back out of the transaction. There is no indication what Schnebly would do if he thought he had a "free choice" in the matter.

There is also evidence that customers were told what a fur "was worth" (Record, p. 107) and how much a fur could be insured for (Record, p. 141). As used by petitioner, then, the advertisements of free appraisals did have the *capacity* to induce purchases.

The facts in the record support the conclusion that the appraisals were promotional devices rather than bona fide estimates of the value of the merchandise. Petitioner appraised the furs at the top of their retail value—"at the highest figure he and his sales manager thought they could be sold for," anywhere. (Record, p. 40.) This appraisal figure almost always exceeded the actual price for which petitioner sold the goods. These facts must be considered in light of petitioner's well-advertised claims that he sold his goods below cost (Ex. C X, 4, 5, 103, 104, 105 and 107), and particularly the fact that customers were informed of appraisal values before purchases. From such facts it is reasonable for a trier of fact to infer that the appraisals were made to promote sales, rather than to reach a proper evaluation for insurance purposes.

Finally petitioner contends that paragraph 2E of the Commission's order (Record, p. 46) should be altered by striking the words "having no pecuniary or other interest in such fur products." This would permit petitioner to continue to advertise "written bonded appraisals" and to continue to render the appraisals himself. The order, if so revised, would simply require that petitioner's appraisals be bona fide and authentic.

■ The Commission need not trust petitioner to reform his past practices. The Commission has, instead, commanded that *when petitioner advertises an offer of written appraisals,* he shall provide appraisals by qualified *and* disinterested appraisers. This remedy, we think, is an appropriate one, bearing a reasonable relationship to the unlawful advertising practices found. The remedy selected is one which the Commission, in its "wide discretion," was entitled to choose. Siegel Co. v. Federal Trade Comm., 1946, 327 U.S. 608, 611, 66 S.Ct. 758, 90 L.Ed. 888; F. T. C. v. Mandel Brothers, supra, 359 U.S. at pages 392–393, 79 S.Ct. at page 824.

In our opinion, none of the points raised by petitioner are meritorious. We therefore *affirm* the order, and require petitioner to obey it (15 U.S.C.A. § 45(c)).