Leon A. TASHOF, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 22702.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 9, 1969.

Decided Dec. 24, 1970.

Mr. David J. McKean, Washington, D. C., with whom Mr. Thomas J. Whitehead,

Washington, D. C., was on the brief, for petitioner.

Mr. Alvin L. Berman, Atty, Federal Trade Commission, for respondent.

Before BAZELON, Chief Judge, and LEVENTHAL and ROBB, Circuit Judges.

BAZELON, Chief Judge:

Appellant Leon A. Tashof is engaged in the retail trade as New York Jewelry Co. (NYJC). His store is located in an area that serves low-income consumers,[1] many of whom hold low-paying jobs, and have no bank or charge accounts.[2] About 85 percent of NYJC's sales are made on credit. The Commission found, after a Hearing Examiner had dismissed the charges as unsubstantiated, that NYJC falsely advertised the availability of discount eyeglasses, and misrepresented its prices and credit practices. NYJC claims that the evidence is insufficient to support the Commission's findings, and that in any event the findings do not justify the order entered against it. We affirm the findings, and enforce the order.

## I. The Findings

The Commission's findings fall into four categories: (A) those with respect to false advertising of eyeglasses; (B) those with respect to false advertising of discount prices; (C) those with respect to misrepresenting credit charges; and (D) those with respect to misrepresenting "easy credit."

*A. False Advertising of Eyeglasses:* The Commission first found that NYJC employed a "bait and switch" maneuver with respect to sales of eyeglasses.[3] The evidence showed that NYJC advertised eyeglasses "from $7.50 complete," including "lenses, frames and case." The newspaper advertisements, but not the radio advertisements, mentioned a "moderate examining fee." During this period, NYJC offered free eye examinations by a sign posted in its store, and through cards it mailed out and distributed on the street.[4] NYJC claimed that it offered $7.50 eyeglasses only to persons with their own prescriptions. But we have no doubt that the record amply supports the Commission's finding that the advertising campaign taken as a whole offered complete eyeglass service for $7.50.[5]

That much shows "bait." There was no direct evidence of "switch"—no direct evidence, that is, that NYJC disparaged or discouraged the purchase of the $7.50 eyeglasses, or that the glasses were unavailable on demand, or unsuited for their purpose. The evidence on which the Commission rested its finding was a stipulation that out of 1,400 pairs of eyeglasses sold each year by NYJC, less than 10 were sold for $7.50 with or without a prescription.[6] NYJC

---

1. The Commission made this finding on the basis of expert testimony. *See* Commission Opinion at 3. *See generally* FTC Economic Report on Installment Credit and Retail Sales Practices of District of Columbia Retailers 2–5 (1968); FTC Report on District of Columbia Consumer Protection Program (1968).

2. *See* Appendix A to Commission Opinion (profiles of NYJC's customers).

3. "Bait and switch" describes an offer which is made not in order to sell the advertised product at the advertised price, but rather to draw a customer to the store to sell him another similar product which is more profitable to the advertiser. *See generally* Guides Against Bait Advertising, 16 C.F.R. § 238 (1970).

4. NYJC introduced evidence that it actually gave free eye examinations on request.

5. *See, e. g.,* Mytinger & Casselberry, Inc. v. FTC, 112 U.S.App.D.C. 210, 217, 301 F.2d 534, 541 (1962).

6. With the permission of NYJC, the Commission also projected figures from the first six months of 1966 back to annual figures for 1964 and 1965. These figures showed that no eyeglasses were sold for less than $15. The average price per pair was $41.70; only two pairs were sold for as low as $15, and 90 per cent of the sales were over $23.

claims that this evidence does not support the finding. We disagree.

It seems plain to us that the Commission drew a permissible inference of "switch" from the evidence of bait advertising and minimal sales of the advertised product.[7] At best only nine sales—64/100 of one percent of NYJC's eyeglass sales—were made at $7.50. The record leaves unexplained why NYJC's customers, presumably anxious to purchase at as low a price as possible, would so consistently have bought more expensive glasses if suitable glasses at $7.50 were available.[8] Further, NYJC continued to advertise the $7.50 glasses for a year and a half despite the scarcity of sales, a fact which tends to support a finding of a purpose to bring customers into the store for other reasons.[9] This evidence, we think, was sufficient to shift the burden of coming forward to the respondent. But NYJC offered no evidence to negate the inference of "switch." The relevant facts are in NYJC's possession, and it was in the best position to show, if it could be shown at all that the $7.50 glasses were actually available in the store.[10] Yet the most NYJC could produce was its sales manager's denial that the $7.50 glasses were disparaged. NYJC never did point to even a single sale of the advertised product.[11]

■ **B. False Advertising of Discount Prices:** There is no dispute that NYJC claimed to be a discount seller of eyeglasses. Nor is there any question that the sales slips introduced by the FTC were sufficient to show NYJC's actual prices. NYJC's claim is that the Commission erred in relying on expert testimony of prevailing prices, and in computing the prices against which NYJC's were compared.

■ The Commission's staff presented the only evidence of prevailing prices: the testimony of Dr. Zachary Ephraim, an optometrist.[12] Since optometrists are a major retail outlet for eyeglasses, and perform a service closely comparable to that provided by NYJC—examining eyes and filling prescriptions—Dr. Ephraim was well qualified to testify about prevailing prices. We hold

---

7. See National Lead Co. v. FTC, 227 F.2d 825, 832 (7th Cir. 1955), rev'd on other grounds, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957); cf. Giant Food Inc. v. FTC, 116 U.S.App.D.C. 227, 322 F. 2d 977 (1963), cert. dismissed, 376 U.S. 967, 84 S.Ct. 1121, 12 L.Ed.2d 82 (1964); NLRB v. Clement Bros. Co., 407 F.2d 1027, 1029 (5th Cir. 1969).

8. Cf. Note to Guides Against Bait Advertising, supra note 3:
 "Sales of the advertised merchandise do not preclude the existence of a bait and switch scheme. It has been determined that, on occasions, this is a mere incidental byproduct of the fundamental plan and is intended to provide an aura of legitimacy to the overall operation.

9. The customer profiles and affidavits before the Commission showed that NYJC often used high pressure techniques to sell its eyeglasses. On occasion, for example, persons who accepted free eye examinations stated they were told they had to purchase glasses prepared for them after the examination, although they had not ordered the glasses.

10. Compare Midwest Sewing Center, Inc., CCH Transfer Binder ¶ 17,143 (Dec. 3, 1964), where the respondent introduced evidence which tended to negate the inference of bait and switch, and the Commission dismissed the complaint.

11. Notwithstanding the fact that the Hearing Examiner might have credited the sales manager's story, we believe the record as a whole supports the Commission's findings, because the stipulated evidence combined with NYJC's evident inability to contradict its implications outweigh the manager's ambiguous denial of the charge. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 487–488, 492–496, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Mannis v. FTC, 293 F.2d 774, 776 (9th Cir. 1961).

12. Dr. Ephraim qualified as an expert because he had practiced optometry in the District for 18 years, was President of the Board of Examiners of Optometry, and Vice President of the District of Columbia Optometric Society.

that his uncontradicted testimony was a sufficient basis for the Commission's findings.[13]

■ The Commission determined the generally prevailing prices of eyeglasses on the basis of Dr. Ephraim's testimony of the usual price charged by most optometrists in the trade area.[14] NYJC first claims that the Commission erroneously ignored the expert's statements that some sellers might charge higher prices. We disagree, because Dr. Ephraim referred only to some extremely high prices that a relatively few sellers might charge. Thus the record as a whole supports the Commission's finding of generally prevailing eyeglass prices, i. e., the prices to which NYJC's must be compared in considering the charge that its representations of discount prices were false.[15] NYJC's second claim concerns the Commission's refusal to include in the prevailing price the amount which the consumer would have had to pay for an eye examination. Since NYJC offered "free" eye examinations, it could be argued that no adjustment for examinations was required. But the Commission did make allowance for NYJC's actual cost of the examination. We cannot say that this treatment was unreasonable.[16] It is worth noting that even if the prevailing prices were computed as NYJC has urged, NYJC's customers still paid a higher than prevailing price more often than not.[17]

*C. Failure to Disclose Credit Charges:* Nearly all the evidence regarding NYJC's failure to inform its customers fully and adequately of all credit charges was documentary.[18] It showed that NYJC used three different contract forms during the time in question. All three were materially deficient in one respect or another. The first form failed to disclose the annual percentage charge on the unpaid balance, the dollar amount of the credit charge, and the cash price of the item. The second form failed to show either a monthly or annual percentage interest rate. The third form failed to reveal the total obligation, the finance charge in dollars, and the annual percentage interest rate. Moreover, there was substantial evidence that NYJC often failed even to provide all the information contemplated by the contract form. Also, the evidence revealed unexplained discrepancies among

13. The Hearing Examiner, for no apparent reason, failed to make findings on this charge. With respect to the issue of unconscionably high prices, see section I(D) (2), *infra*, however, he found, after adjusting the prevailing price as NYJC urged, that the store's eyeglass prices "are well within normally encountered limits." This is no support for the view that NYJC sold at discount prices.

14. Dr. Ephraim based his testimony on the prices that members of the Optometric Society would charge. This group included some 52 percent of the practicing optometrists in the District, according to the expert. He also stated that non-members would generally charge less for glasses than would members.

15. *Cf.* FTC v. Standard Education Society, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141 (1937); Niresk Industries v. FTC, 278 F.2d 337 (7th Cir. 1960); Guides Against Deceptive Pricing, 16 C.F.R. § 232 (1970). On the basis of the Commission's calculations, NYJC's eyeglass prices averaged 202 percent of the trade area prices.

16. The expert witness had testified to prices which did not include eye examinations. The Commission subtracted $5.00 from NYJC's price—the actual cost of an eye examination to NYJC—before comparing it to the prevailing price. NYJC claims that the proper adjustment would have been to increase the prevailing price by $15.00, the amount a customer would usually pay for an examination. Even if we were to accept this contention, the evidence would show that NYJC's prices for the glasses in evidence were from three to 72 percent higher than the prevailing prices.

17. *See* Table 3 of NYJC's Brief.

18. Since the Hearing Examiner's dismissal of the charge did not rest on his determination of the credibility of witnesses, nothing prevented the Commission from inspecting the evidence and drawing its own conclusions. *See* Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

NYJC's contract forms, its own internal records, and the "customer cards" it handed to credit clients.

We think the record amply supports the Commission's finding that NYJC's credit practices were deceptive. The offer of credit without disclosure of the charges therefor in an understandable fashion is, of course, likely to prevent the customer from learning about the cost of credit. This is particularly true for NYJC's customers, many of whom both lack the sophistication to make the complex calculation of credit costs for themselves, and must depend to a large extent on credit for their purchases.[19]

*D. False Representation of "Easy Credit"*: NYJC's advertising was permeated with references to "easy credit."[20] The complaint charged that the credit was not easy for two reasons: first because NYJC sought "often with success, to obtain garnishments against [customer's] wages," after having extended credit "without determining [the customer's] credit rating or financial ability to meet payments;"[21] and second because NYJC sold goods "at unconscionably high prices that greatly exceeded the prices charged for like or similar merchandise by other retail establishments."[22] We hold that the record supports the Commission's finding that NYJC's representations of easy credit were misleading because of its rigorous collection policy. Consequently, there is no need to decide whether the

Commission's finding that the representations were misleading because of the store's "greatly excessive prices" is adequately supported.

*1. Rigorous Collection Policy*—The Commission found that NYJC's collection policies were rigorous indeed, and therefore its representation of easy credit was misleading. The record supports this finding.[23]

We have no doubt that the Commission was within its discretion in interpreting "easy credit" to refer not only to easy availability but also to easy terms and leniency with respect to repayment and collection.[24] The Commission noted the oppressive effect of wage garnishments on persons who, like many of NYJC's customers, have low paying jobs, and found that NYJC regularly garnished its customers' wages.[25] In one year, for example, it sued some 1600 customers—about one out of every three. Firms with many more customers than NYJC used the garnishment process much less often.[26] NYJC, which possessed all the relevant facts, offered nothing to negate the Commission's finding that it pursued a rigorous collection program, and, indeed, in this court did not challenge the Commission's opinion on this point.

█ NYJC does claim, however, that the complaint did not fairly apprise it of the charge that its easy credit representations might be found misleading on

---

19. *See* Appendix A to Commission Opinion (profiles of NYJC's customers).

20. One of NYJC's radio advertisements, for example, ended as follows (capitalization in the original copy) :
 Now a message from that GRAND GENTLEMAN MR. TASH, THE MANAGER OF NEW YORK JEWELRY CO. * * *, "I'll help you enjoy the GOOD THINGS OF LIFE. I'll give you ee-asy CREDIT TERMS."

21. Paragraph 8(1) of the Complaint.

22. Paragraph 7(2) of the Complaint.

23. The Hearing Examiner made no finding on this charge.

24. *See* Commission Opinion at 33, 42–43. In some contracts, NYJC was empowered to declare the entire amount due and payable on any default in payment, to take immediate possession without demand or notice (even entering the purchaser's property for that purpose), and to have the customer pay collection agency and attorney's fees.

25. *See id.* at 41. Apparently NYJC extended credit to any person who had a job, and whose wages were not being garnished. Expert testimony confirmed that this was not the usual practice.

26. *See id.*

the basis of its collection policy.[27] Although the complaint is hardly a model of clarity, we think that a fair reading provides sufficient notice.[28] It is clear that the main charge is misrepresentation by use of the term "easy credit," not, as NYJC has urged throughout the course of proceedings, unconscionably high prices per se. High prices were but one of the two independent grounds said to make the representation deceptive. The other was NYJC's collection policies. Moreover, NYJC has claimed no prejudice from the alleged vagueness of the complaint.[29] It has pointed to no evidence it might have introduced if it had been given clearer notice of the charge. And by the time of the hearing it must have known that its collection policies were under attack, for it agreed to a stipulation about the number of garnishments it, and other stores, filed each year.

*2. Greatly Excessive Prices*—The other ground for the Commission's ultimate conclusion that NYJC's representations of "easy credit" were misleading

was its finding that NYJC charged "greatly excessive prices."[30] We need not decide whether this finding is adequately supported, however, for, even if it is not, we have no "substantial doubt [that] the administrative agency would have made the same ultimate finding [*i. e.*, that NYJC's representations of "easy credit" were misleading] with the erroneous findings or inferences out of the picture."[31] In this case it is clear from the structure of the Commission's opinion[32] and the reasons it gave in support of its order[33] that NYJC's representations of "easy credit" were considered misleading on two separate grounds, to wit, the store's rigorous collection practices and its greatly excessive prices.

## II. The Order

NYJC attacks only two parts of the Commission's order—one paragraph which orders it to disclose certain credit information, and one paragraph which forbids it to advertise discount prices without having taken a survey of comparative prices.[34]

27. *See* 5 U.S.C. § 554(b) (1964); *cf.* Rodale Press Inc. v. FTC, 132 U.S.App. D.C. 317, 407 F.2d 1252 (1968).

28. See the portions of the complaint quoted at the beginning of section I (D). *Cf.* Federated Nat'l Wholesalers Serv. v. FTC, 398 F.2d 253, 258 (2d Cir. 1968); Armand Co. v. FTC, 84 F.2d 973, 974–975 (2d Cir.), cert. denied, 299 U.S. 597, 57 S.Ct. 189, 81 L.Ed. 440 (1936).

29. *See* J. B. Williams Co. v. FTC, 381 F.2d 884, 888 (6th Cir. 1967).

30. The Commission apparently developed two theories to explain why high prices made a representation of "easy credit" misleading. One theory seems to be that "easy credit" represented to the customer that NYJC's cash price for its merchandise was "not substantially higher than prices generally prevailing in the trade area for the product." Commission Opinion at 33. Evidence of NYJC's high prices, then, was said to show the falsity of NYJC's representation. The other theory is that while "easy credit" represented that "the charge imposed for credit will be reasonable," NYJC hid a credit charge in its high prices so that "in fact the credit might be costing [the

customer] dearly." *Id.* at 32; *cf.* FTC Economic Report, *supra* note 1, at 18–20. These theories were mixed together in such a way that it is not clear which one is the basis of the Commission's conclusion that NYJC's high prices made its representations of "easy credit" misleading.

31. NLRB v. Reed & Price Mfg. Co., 205 F.2d 131, 139 (1st Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953); *cf.* Massachusetts Trustees of Eastern Gas and Fuel Associates v. United States, 377 U.S. 235, 84 S.Ct. 1236, 12 L.Ed.2d 268 (1964). *See generally* Braniff Airways, Inc. v. CAB, 126 U.S. App.D.C. 399, 379 F.2d 453 (1967).

32. *See* Commission Opinion at 40–44.

33. *Id.* at 47–48.

34. NYJC also claims that the Commission was too vague in ordering it to cease and desist from representing that its "terms of credit are *lenient*, including but not limited to representations that respondent offers 'easy credit'. * * *" (Emphasis added.) In the context of this case, we think the word "lenient" describes precisely the deceptive practice the Commission has barred, *see* part I (D) (1), *supra*. *See* Giant Foods Inc. v. FTC,

**714**

*A. Disclosure of Credit Terms*: To combat NYJC's failure to reveal its credit terms (see part I (C) ), the Commission ordered it to disclose, both orally and in writing, a variety of factors relating to credit charges in its installment contracts.[35] NYJC argues that the enactment of the new Truth in Lending Act [36] shows that the Commission had theretofore lacked the power to order affirmative disclosures of credit information.[37] The argument is without merit. The Act establishes *minimum standards of disclosure* which the Commission may enforce without proving unfairness and deception on a case by case basis. It was not intended to cure a previous deficiency in Commission power to deal with individual cases, and to shape its remedies to the facts of these cases.[38]

Equally unpersuasive is NYJC's contention that the Truth in Lending Act sets the bounds of an affirmative disclosure order. NYJC has pointed to nothing in the terms of the Act or its legislative history which supports this view. The sole question for us is whether the remedy chosen by the Commission bears a reasonable relationship to the violations uncovered.[39] Viewed in this light, NYJC's attacks on the disclosure order are unavailing. The Commission's demand that NYJC disclose credit terms in all transactions, for example, is reasonably related to its finding that many of NYJC's sales involved a small dollar credit charge, but a high percentage rate, and that credit information is crucial to NYJC's low-income customers. Thus the fact that the Truth in Lending Act exempts sales involving minimal dollar charges [40] is not

---

116 U.S.App.D.C. 227, 237, 322 F.2d 977, 987 (1967) ("usual and customary" upheld against attack as too vague).

35. The order requires NYJC to disclose the following information before a customer obligates himself to make a credit purchase: (a) the cash price; (b) the amount of any down-payment or trade-in; (c) the net cash price; (d) all other charges included in the amount of credit extended, but not part of the finance charge; (g) the annual percentage finance charge; (h) the total credit price, and the due dates of payments; (i) the consequences of late payments; (j) the security interest retained by NYJC.

NYJC is also required to disclose some of this information if it advertises its credit practices.

36. 15 U.S.C. §§ 1601 *et seq.* (Supp. V, 1970).

37. NYJC also claims that the Commission is without power to order affirmative disclosure of credit information unless the original representation was misleading. It says its representations were not misleading, but at worst incomplete. But we have long since passed the point where the power of the Commission to reach statements that are deceptive because they contain less than the whole truth can be doubted. *E. g.*, Ward Laboratories, Inc. v. FTC, 276 F.2d 952, 954 (2d Cir.), cert. denied, 364 U.S. 827, 81 S.Ct. 65, 5 L.Ed.2d 55 (1960).

38. See Hearings Before A Subcommittee of the Senate Committee on Banking and Currency on S. 1740, 87th Cong., 2d Sess. 154, 158 (testimony of Commissioner Dixon). See also, as examples of the Commission's prior dealings with credit transactions, General Motors Corp., 30 F.T.C. 34 (1939), aff'd, 114 F.2d 33 (2d Cir. 1940) ; World Wide Television Corp., ¶ 17,087 CCH Trade Reg.Rptr. (1963–65 Transfer Binder), aff'd, 352 F.2d 303 (3d Cir. 1965) (per curiam).

39. *E. g.*, Jacob Siegel Co. v. FTC, 327 U.S. 608, 66 S.Ct. 758, 90 L.Ed. 888 (1946) ; Consumers Products of America, Inc. v. FTC, 400 F.2d 930 (3d Cir. 1968), cert. denied, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969).

This same test applies, of course, to those parts of the order which duplicate the requirements of the Truth in Lending Act. For example, both the order, *see* note 35 *supra*, and Regulation Z interpreting the Truth in Lending Act, *see* 12 C.F.R. § 226.8(b) (3) (1970), require NYJC to disclose the total price including credit charges, and the number and due dates of payments, and the amount of each payment. Since this part of the Commission's order is reasonably related to its findings, *see* part I (C), *supra*, we enforce it.

40. 15 U.S.C. § 1638(a) (7) (Supp. V, 1970).

controlling. Similarly, the Commission's order that NYJC disclose its credit terms orally[41] is reasonably related to the finding that many of NYJC's customers are unsophisticated consumers who would not benefit from written disclosure alone. That the Truth in Lending Act has no such requirement does not invalidate this portion of the order.

B. *Advertising Discount Prices:* The Commission ordered NYJC to cease and desist from representing that it sells "any article of merchandise" at a discount price (see part I (B) ), unless it first takes a "statistically significant survey" which shows that the prevailing price is "substantially" above NYJC's. The order apparently subjects NYJC to civil penalties[42] if it advertises discount prices without having taken the survey, even if the advertisement is true.[43]

 The Commission claims that this remedy constitutes "reasonable action * * * calculated to preclude the revival of the illegal practices."[44] We agree. NYJC was shown to have taken little account of the true level of prices in the trade area.[45] We think the FTC may

enter an order to ensure that this is not repeated in the future, without having to determine whether respondent's previous conduct was due to inadvertence, bad faith, or a kind of inattention or negligence involving some intermediate culpability. Where a businessman has wrought a wrong on the public, he may be held to a reasonable business procedure that will prevent repetition of that wrong, and in view of his past record he will not be permitted to object that his own approaches might also avoid this wrong in the future, perhaps by happenstance and perhaps only on occasion.

 NYJC has offered nothing either here[46] or before the Commission[47] to support its assertion that the statistical survey requirement is unduly burdensome. The requirement does not appear onerous on its face. Thus the order must be enforced.

Enforced.

ROBB, Circuit Judge (concurring in part; dissenting in part):

I concur in all but Part IIB of the majority opinion. In my judgment the

41. NYJC also claims that in a later suit for civil penalties it will not be able to defend against a charge that it failed to disclose all credit information orally. We are unconvinced by this hypothetical fear. First, if it turns out to be a real problem, the Commission can be consulted before a penalty action. *See* 16 C.F.R. § 3.61(c) (1970); FTC v. Colgate-Palmolive Co., 380 U.S. 374, 394, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965). Second the Commission has the burden of proof in a compliance action, *see* Western Radio Corp. v. FTC, 339 F.2d 937 (7th Cir. 1964). NYJC could show that it had not violated the order by evidence of its continuing policy of oral disclosure, and/or by bringing forward the salesmen who had handled the complaining customers.

42. 15 U.S.C. § 45(*l*) (1964) ($5,000 per violation).

43. *Compare* National Lead v. FTC, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957), reversing 227 F.2d 825, 844 (7th Cir. 1955).

44. National Lead v. FTC, 352 U.S. 419, 429, 77 S.Ct. 502, 509, 1 L.Ed.2d 438

(1957). *See also* Consumers Prod. of America v. FTC, 400 F.2d 930, 934–935 (3d Cir. 1968); S & S Pharmaceutical Co. v. FTC, 408 F.2d 487, 489 (5th Cir. 1969).

45. *Cf.* Guides Against Deceptive Pricing, 16 C.F.R. § 232.2(a) (requires an advertiser to be "reasonably certain" that a substantial number of sales are made at the price to which he compares his own); *id.* § 233.3(e) ("A retailer competing in a local area has at least a general knowledge of the prices being charged in his area.").

46. NYJC did not seek relief under 15 U.S.C. § 45(c) (1964), which permits a party to "apply to the court for leave to adduce additional evidence" before the Commission, if the evidence is material and "there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Commission."

47. NYJC did not petition the Commission to reopen the proceedings to consider the present claim. *See* 15 U.S.C. § 45(b) (1964); 16 C.F.R. § 4.29(a), as amended 16 C.F.R. §§ 3.71, 3.172(a) (1970).

**716**

Commission exceeds its authority when it requires NYJC to conduct a "statistically significant survey" of relevant prices in its trade area before advertising a "discount price". This requirement shifts to NYJC the burden of proving its innocence; and as the majority opinion concedes, might subject NYJC to heavy civil penalties even if its advertisement is true. I would affirm after eliminating this part of the order.