229 P.3d 871 (2010)
Kathleen WALKER, a single person, and Florence Pedraza, a single person, Appellants,
v.
WENATCHEE VALLEY TRUCK AND AUTO OUTLET, INC., d/b/a Wenatchee Kia, a Washington Corporation, Respondent and Cross-Appellant.
No. 27709-7-III.
Court of Appeals of Washington, Division 3.
March 18, 2010.
Reconsideration Denied April 21, 2010.
*873 Eugene Nelson Bolin, Jr., Attorney at Law, Seattle, WA, for Appellants.
Robert Keith Hunter, Jr., Hunter Law Firm PLLC, East Wenatchee, WA, for Respondent/Cross-Appellant.
KORSMO, J.
¶ 1 The trial court granted summary judgment dismissing these claims after determining that the one year statute of limitations in the Auto Dealer Practices Act (ADPA) applied rather than the four year statute of limitations of the Consumer Protection Act (CPA). We disagree and reverse that aspect of the ruling, but affirm on alternate grounds.

FACTS[1]
¶ 2 These cases arise from an off-site automobile sale conducted in Ellensburg by respondent Wenatchee Kia. For one week in September 2002, Kia had vehicles in an Ellensburg parking lot and advertised locally on radio and in the newspaper. Of interest here, the ads featured a soft top two-door Kia Sportage four-wheel-drive vehicle for $12,995, which was calculated by stating the "sale price" of $15,995 and subtracting a $3,000 factory rebate.[2] Both the print and radio ads also mentioned zero percent interest rates, no money down, and no payments for three months. The print ads also stated that the four-door hard top Sportage model was for sale at "similar savings."
¶ 3 Walker Case. Kathleen Walker and her 16-year-old daughter, Ashley, went to Ellensburg to shop. Ms. Walker had suffered brain damage from having a tumor surgically removed years earlier. Ashley made most of the family decisions since Ms. Walker had difficulty with many major life activities such as eating, talking, and bathing. She was unable to read or write.
¶ 4 Ashley had seen the Kia ads in the newspaper and thought that prices were very low and zero percent financing was a good deal. The family's 1993 minivan was still in good shape, but did get stuck in the snow. She thought a four-wheel-drive vehicle might be safer to drive. As they were leaving the store, Ashley saw the cars and went to check them out. Her mother stayed in the minivan.
*874 ¶ 5 None of the vehicles had advertised sales prices on them. Ashley did not see any two-door Sportage models. She got back in the minivan and started to drive away. A salesman named Brad ran out waving his arms and blocked the car's path. A conversation ensued and Brad told them that there were many good deals on the lot because the dealer did not want to transport the vehicles back to Wenatchee. He also told them that any car could be financed at zero percent interest. Ashley said "he made it sound like he was ready to sell us a car for even less than the prices in the newspaper." Clerk's Papers (CP) 1025.
¶ 6 Ashley and her mother got out of the car and looked at Sportages with Brad. They settled on a four-door hard top silver Sportage with a manual transmission. Ashley did not drive a manual transmission, but Brad assured her she could easily learn. He also convinced her to trade in the minivan rather than sell it herself. Brad went with the two to their apartment in town to try and find title to the minivan. He slept on the couch while the two women unsuccessfully searched for the title. He then went with them to their house out of town where the title was located.
¶ 7 Upon returning to the sales lot, Brad went to talk to the sales manager. Brad came out with a sale price of $20,000 for the Sportage and a $4,000 trade-in for the minivan. Ms. Walker and Ashley went in to meet the sales manager, Robert Ramin, whom they informed about Ms. Walker's disability. Mr. Ramin advised Ms. Walker that she had good credit. As a result of that comment, Ms. Walker expected to receive zero percent financing. Instead, a total of $16,311.96 was financed over four years at 4.9 percent. She received a $3,000 manufacturer's rebate instead of the zero percent financing.[3]
¶ 8 Ms. Walker was unable to sign the sales agreement. At Mr. Ramin's request, Ashley signed the document in her mother's name. Ashley then had a friend come and drive them home in their new Sportage. Ashley did learn to drive the Sportage. The following summer she was driving the vehicle when it was blown off the road. The Sportage rolled and was destroyed.
¶ 9 Pedraza Case. Florence Pedraza, 86, supplemented her retirement by working at the Ellensburg Taco Bell with Ashley. She noticed the newspaper advertisements for the Kia sale and went to the lot looking for the advertised convertible Sportage for $13,000. Instead, she only saw hard top models. She told the salesman she was looking for a four-wheel-drive vehicle. She took a test drive. The salesman told her the price, including "tax and everything," was $19,000. CP 1461. There was no discussion of zero percent financing or a manufacturer's rebate. She made a $3,000 down payment and financed the balance.
¶ 10 The sales agreement showed that Ms. Pedraza paid a total of $23,834.01, including tax, for the Sportage. A manufacturer's rebate of $3,000 was applied to the price. After her own down payment, the $17,893.01 balance was financed over 72 months at 8 percent interest.
¶ 11 Following Ashley's accident, Ms. Pedraza traded her Sportage in on a new Subaru. At that point she discovered how much she had actually paid for the car. With the cost of the financing, the total had reached $29,000.
¶ 12 Litigation History. A complaint, styled as a class action, was filed July 22, 2005. It invoked the CPA and alleged, in essence, that the dealership did not live up to its advertising. Rather than answer the complaint, the dealer moved for dismissal under CR 12(b)(6), arguing that the complaint was untimely under the statute of limitations applicable to the ADPA. The motion to dismiss and a motion for change of venue were denied on December 22, 2005. Counsel for the plaintiffs was directed to prepare an order and note it for presentation.
*875 ¶ 13 Minimal court activity occurred during 2006, although the parties engaged in discovery and negotiations. On September 20, 2007, the court issued a notice that the case would be dismissed for lack of prosecution under CR 41(b) unless good cause was shown within 30 days. Defendant dealership filed a motion to dismiss on October 5, 2007, and also filed an alternative motion to deny class certification. The purchasers responded by filing a motion for default judgment because no answer had been filed to the complaint. They also presented the order denying the 2005 motions and filed motions to set a case schedule and compel discovery.
¶ 14 The trial court granted the dealer's motion to dismiss for lack of prosecution on December 10, 2007. The purchasers moved for reconsideration and the trial court directed the dealership to respond. The court granted reconsideration on February 8, 2008 and vacated the order of dismissal.
¶ 15 Five days later the dealership renewed its motion to deny class certification. It also answered the complaint. On February 28, 2008, the trial court denied the dealer's CR 12(b)(6) motion based on the statute of limitations. The dealership then unsuccessfully sought discretionary review with this court.
¶ 16 The trial court granted the motion to deny class certification on April 14, 2008. A motion for reconsideration of that decision was subsequently denied.[4]
¶ 17 The purchasers moved for summary judgment on their claims. The dealership responded with a cross motion for summary judgment. It argued that the claims were barred by the statute of limitations and by laches, and also contended that the claims were legally insufficient.
¶ 18 The trial court agreed, concluding that the one year limitation period of the ADPA applied. The court also decided that the purchasers had not established a causal connection between the dealership's sales practices and their decision to buy the vehicles. CP 1532-1533. The court granted the dealership's motion for summary judgment and denied the purchasers' motion for summary judgment.
¶ 19 The purchasers appealed from the order of dismissal. The dealership cross-appealed from the reconsideration of the CR 41(b) ruling.[5]

ANALYSIS

Statute of Limitations
¶ 20 The primary question presented by this appeal involves the interplay of the statutes of limitations found in the CPA and ADPA. That question presents an issue of law which this court reviews de novo. Cosmopolitan Eng'g Group, Inc. v. Ondeo Degremont, Inc., 159 Wash.2d 292, 298, 149 P.3d 666 (2006) ("Statutory interpretation is a question of law, subject to de novo review.").
¶ 21 Chapter 46.70 RCW regulates the practices of automobile dealers and manufacturers in this state. This chapter was first enacted in 1967 "in order to prevent frauds, impositions, and other abuses upon its citizens and to protect and preserve the investments and properties of the citizens of this state." RCW 46.70.005. To that end, the legislation prohibits numerous practices, including:
To cause or permit to be advertised, printed, displayed, published, distributed, broadcasted, televised, or disseminated in any manner whatsoever, any statement or representation with regard to the sale, lease, or financing of a vehicle which is false, deceptive, or misleading,....
RCW 46.70.180(1).
¶ 22 RCW 46.70.190 provides a right of action to "any person who is injured in his business or property by a violation" of chapter 46.70 RCW that includes recovery of actual damages and an award of reasonable attorney fees. The statute further provides that any "civil action brought in the superior court pursuant to the provisions of this section must be filed no later than one year *876 following the alleged violation of this chapter."
¶ 23 Washington's Consumer Protection Act, chapter 19.86 RCW, was enacted in 1961. The essence of the act is found in RCW 19.86.020: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." A person injured by a violation of RCW 19.86.020 or other sections of chapter 19.86 may bring a civil action for damages. RCW 19.86.090. Subject to a tolling provision that is not relevant here, "any action to enforce a claim for damages under RCW 19.86.090 shall be forever barred unless commenced within four years after the cause of action accrues." RCW 19.86.120.
¶ 24 The elements of a CPA violation are (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) which affects the public interest, (4) injury to the plaintiff, and (5) a causal link between the unfair or deceptive act and the injury. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wash.2d 778, 780, 784-785, 719 P.2d 531 (1986).
¶ 25 With respect to alleged deceptive automobile advertising, both the CPA and the ADPA appear to provide causes of action. Indeed, in 1986 the Legislature expressly declared that a violation of chapter 46.70 RCW "is deemed to affect the public interest and constitutes a violation" of the CPA. RCW 46.70.310.
¶ 26 Despite the apparent overlapping coverage, the dealership presents two arguments for finding that the ADPA and its one year statute of limitations should apply exclusively in this case. First, it argues that as the later and more specific statute, the ADPA implicitly supersedes the CPA. Second, it argues that the CPA does not apply due to an express provision of that chapter. We address each of these arguments in turn.

Does ADPA supersede the CPA?
¶ 27 The purpose of statutory construction is to give effect to the meaning of legislation. Roberts v. Johnson, 137 Wash.2d 84, 91, 969 P.2d 446 (1999). In the case of multiple statutes or provisions governing the same subject matter, effect will be given to both to the extent possible. In re Estate of Kerr, 134 Wash.2d 328, 343, 949 P.2d 810 (1998). Efforts will be made to harmonize statutes, particularly if the legislation itself recognizes that multiple statutes may govern. State v. Conte, 159 Wash.2d 797, 806-810, 154 P.3d 194, cert. denied, 552 U.S. 992, 128 S.Ct. 512, 169 L.Ed.2d 342 (2007). Only when two statutes dealing with the same subject matter "conflict to the extent that they cannot be harmonized" will a more specific statute supersede a general statute. Kerr, 134 Wash.2d at 343, 949 P.2d 810.
¶ 28 We believe that the facts and reasoning in Conte are particularly suggestive here. In Conte, the respondents had been charged with crimes relating to campaign contributions under RCW 40.16.030. 159 Wash.2d at 800-802, 154 P.3d 194. The same alleged activities also violated sections of the Public Disclosure Act (PDA), chapter 42.17 RCW. The issue on appeal was whether the civil penalties of the PDA, passed in 1972, superseded the 1909 criminal statute codified at RCW 40.16.030. 159 Wash.2d at 804, 154 P.3d 194.
¶ 29 In reconciling the statutes, the court focused initially on a provision of the PDA, RCW 42.17.390. Id. at 806-810, 154 P.3d 194. That provision stated that violations of the PDA might lead to civil remedies and sanctions "`in addition to other remedies provided by law.'" Id. at 806, 154 P.3d 194. Despite the very explicit and highly regulated PDA reporting requirements (and accompanying sanctions), the court determined that the "other remedies" language showed legislative intent to allow the criminal statute. Id. at 806-807, 154 P.3d 194. In particular, the court found no intent to "foreclose criminal prosecutions under existing statutes." Id. at 808, 154 P.3d 194. The court concluded that RCW 42.17.390 did not preclude a criminal action. Id. at 810, 154 P.3d 194.
¶ 30 With Conte as our guide, two provisions of the ADPA show that it does not supersede the CPA. RCW 46.70.270, an original provision of the 1967 act, states:

*877 The provisions of this chapter shall be cumulative to existing laws: PROVIDED, That the violation of RCW 46.70.180 shall be construed as exclusively civil and not penal in nature.
A second provision, added to the ADPA in 1986, also is informative.
Any violation of this chapter is deemed to affect the public interest and constitutes a violation of chapter 19.86 RCW.
RCW 46.70.310.
¶ 31 These two sections establish that the Legislature did not intend the ADPA to supersede the CPA. Rather, the Legislature expressly intended that the ADPA supplement other legislation, including the CPA. There is no basis for concluding that the CPA is superseded by the ADPA.
¶ 32 The dealership argues that Jindra v. Golden West, 52 Wash.App. 124, 758 P.2d 518 (1988), has already resolved this issue. That is not the case. In Jindra, purchasers sued a dealership for breach of warranty under RCW 46.70.070(1) after their mobile home was found to be contaminated with formaldehyde. Id. at 125, 758 P.2d 518. The action was brought beyond the one year period specified in the ADPA. The question on appeal was whether the one year statute of limitations in RCW 46.70.190 applied to the warranty section of the act. The court concluded that it applied to all actions brought under chapter 46.70 RCW. Id. at 128, 130, 758 P.2d 518. In the course of its analysis, the court noted the cumulative nature of the act and cited the CPA as another statute that could apply. Id. at 128, 758 P.2d 518. Jindra does not limit the application of other statutes to actions also covered by the ADPA.
¶ 33 We see nothing in this legislation that suggests the Legislature intended that the ADPA be the exclusive remedy in this case. The Legislature was free and quite capable of restricting the reach of the CPA when it made that statute applicable to the ADPA. It did not do so. Accordingly, we hold that both acts can be applied to the same conduct and that each act is governed by its own statute of limitations. Here, the complaint was founded solely on the CPA and was filed within the CPA's four-year statute of limitations period. It was timely brought. The trial court erred in concluding otherwise.

Is the CPA inapplicable?
¶ 34 The dealership also argues that by its own terms the CPA is not applicable to advertising-based claims subject to the ADPA. It relies upon RCW 19.86.170, which states in part that the CPA is not applicable to
actions or transactions otherwise permitted, prohibited or regulated under laws administered by the insurance commissioner of this state, the Washington utilities and transportation commission, the federal power commission or actions or transactions permitted by any other regulatory body or officer acting under statutory authority of this state or the United States.
(Emphasis added.)
¶ 35 The dealership argues that automobile dealers are regulated by the Department of Licensing through chapter 308-66 of the Washington Administrative Code and that its advertisements complied with the requirements of the code. It thus reasons that the CPA cannot apply to regulated activities such as automobile advertising. We disagree.
¶ 36 WAC 308-66-152 lists a series of prohibited and unlawful actions in the course of advertising automobile sales prices. It also sets minimum requirements for such disparate matters as the length of time a sales price appears in a television ad, the volume requirements for radio ads, and the type size of a print ad. The dealership's written advertisement does not appear to have run afoul of any provision of WAC 308-66-152.
¶ 37 If the cause of action was based on whether the advertising complied with the administrative code, we would agree that the ADPA would exclusively govern. A violation of the WAC provisions would fall into the CPA's exception for regulated activities. That is not the case here. The complaint alleged that the dealer's sales practices did not conform to its advertising, thus amounting to deceptive behavior in violation of the CPA. In other words, the activity regulated by the code involves advertising, not sales *878 practices. The fact that the dealership advertised its sale does not immunize its allegedly deceptive sales tactics from the reach of the CPA.
¶ 38 An industry practice falls within the regulation exception when the activities in question were "authorized by statute and that acting within this authority the agency took overt affirmative actions specifically to permit the actions or transactions." In re Real Estate Brokerage Antitrust Litigation, 95 Wash.2d 297, 301, 622 P.2d 1185 (1980); accord, Singleton v. Naegeli Reporting Corp., 142 Wash.App. 598, 607-608, 175 P.3d 594 (2008). Stated another way, the activity in question must be expressly permitted instead of merely being not prohibited. No administrative code provision approved or authorized the advertising utilized here. Rather, the ad simply did not run afoul of the code's prohibitions.
¶ 39 The challenged actions were not "permitted, prohibited, or regulated" by another agency. Thus, the exclusion of RCW 19.86.170 was inapplicable. The CPA could apply to this behavior.
¶ 40 The trial court erred in ordering this case dismissed on statute of limitations grounds.

Summary Judgment on CPA Claim
¶ 41 The trial court also dismissed the action on the basis that the parties had not shown a causal connection between the alleged deceptive representations and the purchasers' decision to buy the vehicles. We agree that the evidence was not sufficient to create a factual question for a jury.
¶ 42 The standard of review for cases resolved on summary judgment is a matter of well-settled law. A reviewing court also considers those matters de novo, considering the same evidence presented to the trial court. Lybbert v. Grant County, 141 Wash.2d 29, 34, 1 P.3d 1124 (2000). The facts, and all reasonable inferences to be drawn from them, are viewed in the light most favorable to the nonmoving party. Id. If there is no genuine issue of material fact, summary judgment will be granted if the moving party is entitled to judgment as a matter of law. Id. Because the trial court does not resolve factual disputes, it does not enter findings in relation to a summary judgment.[6]Duckworth v. City of Bonney Lake, 91 Wash.2d 19, 21-22, 586 P.2d 860 (1978).
¶ 43 The trial court determined that the plaintiffs had not established that their injuries were caused by the dealership's alleged deceptive behavior. In particular, the trial court did not see any evidence that the purchasers had been induced by the advertising or representations to make their respective purchases. CP 1533. The fifth element of a CPA claim requires a showing of a causal link between the deceptive actions and the plaintiff's injury. Hangman Ridge, 105 Wash.2d at 785, 719 P.2d 531.
¶ 44 The pleadings, argument, and evidence presented five different claims that allegedly amounted to deceptive acts. CP 6. Plaintiffs first claim that by computing a "sale price" consisting of the MSRP less the rebate, the advertising created the impression that the MSRP was the actual starting price for sales negotiations. In fact, the dealer had a second sticker that raised the price nearly $2,000 above the MSRP. Thus, the dealership calculated the vehicle prices in a manner different from that advertised for the sale vehicles. A jury could find this practice deceptive.
¶ 45 The problem here, however, is that the Sportage was not advertised in the same manner as the other models. Instead of using the MSRP, the advertisement listed a "sale price" of $15,995[7] less the $3,000 rebate, for a total advertized price of $12,995. There is no indication of how the initial "sale price" was calculated. Without reference to the MSRP or some other method of calculating the initial price, the second sticker is not necessarily deceptive. Conceivably, the initial price was set by using the *879 second sticker.[8] The manner in which the soft top Sportage was advertized did not deceive purchasers of hard top Sportages. The advertized sale price for the soft top Sportage does not support the CPA claim.
¶ 46 The complaint next alleged that the plaintiffs were not offered the advertised zero percent interest rates. The ad, however, stated that the zero percent rate was for "36 mos. Select models in lieu of rebate." Furthermore, the fine print also provided that "all offers are on approval of credit." Plaintiffs have not produced evidence that their Sportages were among the "select models" subject to the zero percent offer, or even that they preferred the zero percent financing rate to the $3,000 factory rebate.[9] This theory, too, does not support the CPA claim.
¶ 47 The complaint also alleged that neither plaintiff was offered a zero down payment and were in fact required to make down payments. Both plaintiffs made down payments in addition to applying their factory rebates to the sales price. Neither plaintiff presented evidence that they sought to purchase without making a down payment. The declarations filed on behalf of Ms. Walker do not mention the no-down payment option. Ms. Pedraza was told that she needed to make a down payment since she was not trading in her old car, but she did not indicate that she ever sought to purchase without a down payment. These facts do not support an allegation that the plaintiffs were denied something they were arguably entitled to receive under the advertisement. Rather, they suggest an indifference to the zero down payment option. This evidence is not sufficient to present a factual question for jury consideration.
¶ 48 We also question whether either plaintiff was actually harmed by making the down payment. Whether the present value of the down payment exceeded the additional long term cost that would have resulted from financing a larger amount is unclear. The plaintiffs also do not argue how they were harmed in this regard.
¶ 49 Ms. Walker also argues that she did not receive the three months of deferred payments mentioned in the advertisements.[10] The record does not establish that she ever asked for the deferral, nor does she suggest how she was harmed by not receiving the deferral period. This argument does not support a claim for relief.
¶ 50 Finally, the plaintiffs argue that they were subject to "bait and switch" tactics constituting deceptive behavior actionable under the CPA. While we agree that "bait and switch" could violate the CPA, the plaintiffs have not established that such activities occurred here.
¶ 51 "`Bait and switch' describes an offer which is made not in order to sell the advertised product at the advertised price, but rather to draw a customer to the store to sell him another similar product which is more profitable to the advertiser." Tashof v. F.T.C., 437 F.2d 707, 709 n. 3 (D.C.Cir.1970). This court, in an entirely different context, described the tactic: "Thus, it is illegal for a retailer to advertise a product at a low price when he never intends to fulfill such a sale, but rather to use the offer as bait to draw customers to the store to buy higher-priced merchandise." City of Yakima v. Esqueda, 26 Wash.App. 347, 350, 612 P.2d 821 (1980).
¶ 52 That is not what happened here. The dealership advertised its least expensive versions of each model. The Sportage model featured in the advertisement sold earlier in the week before either of the plaintiffs visited the sales lot. While both were interested in that model, neither asked the salesman for a soft top model or the advertised vehicle. Instead, they were shown the remaining Sportages and each selected one. This was not a situation where sales personnel steered them away from the model they sought. It no longer existed on the sales lot.
*880 ¶ 53 The plaintiffs have not established that any "bait and switch" activities occurred. This theory, too, does not support a claim for relief.
¶ 54 The record suggests that the dealership took advantage of vulnerable customers. It does not establish that CPA violations occurred.
¶ 55 The trial court correctly concluded that there were no material questions of fact that required this case to proceed to jury trial. The court's decision to grant summary judgment on the alternative theory is affirmed.[11]
WE CONCUR: KULIK, C.J., and SWEENEY, J.
NOTES
[1] Since this case was decided on summary judgment, we state the facts in a light most favorable to the appellant purchasers.
[2] All of the other advertised vehicle models had prices calculated by subtracting the rebate from the manufacturer's suggested retail price (MSRP). The Sportage was the only vehicle price not calculated from the MSRP.
[3] In his deposition, confirmed by the written advertisements, Mr. Ramin explained that the $3,000 factory rebate was an alternative to zero percent financing. The price in the advertisement was the MSRP less the $3,000 rebate. The dealership placed a second sticker on every vehicle which raised the price $1,995 above the MSRP. CP 1070, 1075. Only one convertible Sportage was sold in Ellensburg; it sold for more than the MSRP. CP 524.
[4] The purchasers did not appeal this order and it is not before this court.
[5] In light of our disposition of the direct appeal, we do not address the cross appeal.
[6] The trial court did enter findings of fact as part of its order of dismissal. We have not considered them.
[7] According to the deposition of the dealership's general manager, the MSRP for the base model was actually $15,640. CP 524.
[8] It is unclear whether a second sticker was applied to the one soft top Sportage sold during the event. Compare CP 1115 with CP 1116.
[9] We also note Ms. Pedraza's testimony that she expected to finance the car through her own bank strongly suggests that the zero percent financing was not an inducement for her purchase.
[10] Ms. Pedraza did request and receive the three month deferral. CP 524.
[11] Both parties seek attorney fees. We deny their requests. Appellants have not prevailed, but their appeal was not frivolous.